SAMUEL H. DOW & a. v. NORTHERN RAILROAD & a.

A corporation was chartered to construct and operate a railroad between specified points. The charter reserved to the legislature the right to alter, amend, modify, or repeal. After the railroad was put in operation a general statute was enacted, purporting to authorize any railroad corporation to lease its road to any other railroad corporation by a two-thirds vote. Such a lease, for a term of ninety-nine years, was subsequently made in conformity with a two-thirds vote. In a suit in equity, brought by minority stockholders of the lessor corporation, it was *held*, that the lease was invalid as against dissenting stockholders.

BILL IN EQUITY, by Samuel H. Dow and John E. Robertson, stockholders in the Northern Railroad, against the Northern Railroad, the Boston & Lowell Railroad, and the directors of the Northern Railroad, seeking to enjoin the operation of the Northern Railroad by the Boston & Lowell Railroad under a contract of lease.

Answers were filed, and the case was heard at the trial term before CARPENTER, J., both parties introducing evidence. Facts were found by the court, and the case was reserved for the law term by request of parties.

Only so much of the facts are here given as are material to the points upon which the case was decided.

The Northern Railroad was chartered in 1844. The corpora-

VOL. LXVII.   3

tion was authorized to construct and keep in use a railroad from Concord to Lebanon. Section 11 provides that "the legislature may alter, amend, or modify the provisions of this act, or repeal the same, notice being given to the corporation, and an opportunity to be heard." The road was constructed and put in operation within a few years after the charter. Chapter 100, Laws of 1883, enacts that (subject to certain conditions and qualifications) "Any railroad corporation may lease its road, railroad property, and interests to any other railroad corporation," upon such terms and for such time as may be approved by a two-thirds vote of the stockholders of each corporation (section 17). This act contains no provision for the compensation of dissenting stockholders. It was assumed that the Northern Railroad had notice of the proposed passage of this statute. On June 18, 1884, the stockholders of the Northern Railroad, by a vote of more than two thirds, approved a lease to the Boston & Lowell. On the same day, pursuant to this vote, the Northern Railroad, by its president, executed to the Boston & Lowell Railroad a lease for ninety-nine years, of the railroad, rolling-stock, etc., of the lessor, the lessee to pay a specified quarterly rental, and perform various other covenants. The plaintiffs voted against approving the lease, and seasonably filed their bill in equity, praying that the Boston & Lowell Railroad be enjoined from operating the Northern Railroad under the lease, and that the Northern Railroad and its directors be ordered to assume the management of the road.

*Bingham & Mitchell* and *Jeremiah Smith*, for the plaintiffs.

*Josiah H. Benton, Jr.* (of Massachusetts), and *William L. Foster*, for the Northern Railroad.

*William S. Ladd, Charles H. Burns, Daniel Barnard*, and *A. A. Strout* (of Maine), for the Boston & Lowell Railroad.

DOE, C. J.* The Northern Railroad is the name of "a collection of many individuals, united into one body," with certain rights

---

* The result reached by the court in this case was announced by DOE, C. J., at the March adjourned term, 1887, in the following words:

"Dow & a. *v.* NORTHERN RAILROAD & a. Decree for plaintiffs. · The majority of the justices sitting in the case are of opinion that the lease is invalid; that it is a fundamental change of the business of the Northern Railroad Corporation, to the making of which by corporate vote, not unanimous, under an exercise of the reserved power of amendment, the corporators did not assent when they accepted the charter. ALLEN, J., dissents. Any necessary orders may be made at the trial term, or by any justice in vacation.

"The decree is made to-day; the injunction to take effect July 1, 1887."

SMITH and CLARK, JJ., concurred in the decision. ALLEN, J., dissented. BLODGETT, CARPENTER, and BINGHAM, JJ., did not sit.

and duties. Kyd Corp. 13. A private business corporation is "an association formed by the agreement of its shareholders," and its existence "as an entity, independently of its members, is a fiction." It is "essential to bear in mind distinctly that the rights and duties of an incorporated association are, in reality, the rights and duties of the persons who compose it, and not of an imaginary being." Mor. Corp., Preface. "The statement that a cor-

---

At the time when the above result was announced no opinion had been written. Subsequently the chief justice prepared a lengthy written opinion. The manuscript was not, in his lifetime, submitted to his colleagues, nor furnished to the reporter. It was withheld by him with the intention of revising it; an intention which ill health and the pressure of other duties prevented him from carrying out.

In the present report of the opinion some parts of the manuscript are omitted. The omissions consist principally of two classes: (1) Passages which simply furnish additional illustrations and arguments in support of views which are fully stated in the portions of the opinion here printed. (2) Numerous lengthy quotations from authorities (references, however, being here given to the authorities from which these extracts were made). The propriety of making the latter class of omissions may fairly be said to have been submitted to Judge Doe's approval. He consented to allow selections to be made from the manuscript, for publication in the shape of essays in the *Harvard Law Review* (vol. 6, *pp.* 161–183 and *pp.* 213–222 ; vol. 8, *pp.* 295–316 and *pp.* 396–414). The person making the selections abbreviated portions of the opinion by omitting numerous extracts from authorities ; and the proof-sheets of these *Review* articles were revised by Judge Doe. A reprint of the portions of the opinion thus published would, it is believed, contain all the most essential matter; and such was probably Judge Doe's own view when he consented to the publication of the selections. Some additions, however, have now been made from parts of the manuscript not used in those publications; and, in the matter previously printed, a few changes have been made in conformity with Judge Doe's pencil annotations upon the printed pages.

It is probable that the arrangement of topics in the opinion as here printed does not correspond entirely to the original order in the manuscript. The pages of the manuscript were not numbered, and the taking out of portions to print in the *Review* resulted in some confusion. Whatever the original order may have been, it is clearly to be inferred, from memoranda left by the author, that he intended to recast the arrangement of topics, though without making any substantial alteration in the reasoning. Upon a rearrangement of topics, it might, perhaps, have been found advisable to print the elaborate discussion of the Dartmouth College Case as an appendix. But, so far as can be inferred from Judge Doe's memoranda, he intended that this discussion should appear as a part of the main opinion. He believed that a full understanding of the College Case is necessary to explain the history, and to determine the real scope and effect, of the customary clause reserving to the legislature power to alter, amend, or repeal corporate charters. It is not quite certain at what part of the opinion he finally intended to insert the comments upon the College Case. They are printed here (beginning on page 27), after the discussion as to the power of the majority, and before the full consideration of the effect of the reservation.

poration is an artificial person or entity, apart from its members, is merely a description, in figurative language, of a corporation viewed as a collective body: a corporation is really an association of persons. . . ." Mor. Corp., s. 227.

By the first section of the Northern Railroad charter (Laws 1844, *c.* 190) it is enacted " That Timothy Kenrick " and twenty other persons, "their associates, successors, and assigns, shall be and hereby are made a body politic and corporate by the name of the Northern Railroad." Here is no evidence of an attempt to introduce a mystery, or to create a fictitious being, to whom the state can give neither body nor mind. The stockholders are the corporation. They have the entire equitable title and beneficial interest of the property by them put in the corporate trust; and they are the corporate trustee in whom is vested the legal title. All of them, assembled at their annual meeting, choosing their seven directors by ballot, and exercising their stockholding rights in any other legal act, would be the visible body, and the acting mental and moral faculty, whose partnership name is the Northern Railroad. They are made a body, not by the legislature, but by their own several acts of becoming stockholders and joint principals. Under the common law, without a charter, they can form a partnership body by becoming stockholders and joint principals in the business of a stage-coach common carrier between Concord and Lebanon. Under general law, without a special act of incorporation, if a majority of them are inhabitants of this state they can make themselves a railroad corporation. Laws 1883, *c.* 100. "May associate themselves together, by written or printed articles of agreement, for the purpose of forming a railroad corporation," is the language of the act. They are no more made a body by the law than they would be if they should form a corporation under the act of 1883; or an unincorporated partnership under the common law. Whether they are incorporated or not, their company is formed by their contract with each other, and it has such powers and duties as the law allows them to give it, and such as the law grants and imposes. For whatever legal purposes their corporate body may be regarded as unreal, the fiction does not vest all the property in an imaginary being, and does not make the shareholders owners of an imaginary capital stock, for the purpose, or with the consequence, of giving to the majority of them, or to the state, a leasing power which the majority or the state would not have if the partnership were not incorporated.

As the plaintiffs could assent to the lease only in person, or by some agent or agents, and as they have not personally approved it but have seasonably opposed it, one question is, whether by becoming stockholders they conferred a general leasing power over their shares upon a majority of the corporation. Whether the agents' power given by the plaintiffs to the majority is now regarded by either of those parties as too much or too little, it

cannot be revoked or diminished by the minority, or increased by the majority. Neither party have any legal cause of complaint against their own agreement. If the plaintiffs are dissatisfied with the control they have given the majority as their agents, they can withdraw from it by the simple process of selling their shares; if the majority are embarrassed by the need of a larger agency, they can liberate themselves by the same process. The question whether each of the plaintiffs, by the act of buying a share, gave the majority a general leasing power over that share, is not affected by the circumstance that such power, if given by him, could not be lawfully exercised until the state consented, as it did by the act of 1883, to accept the lessees as substitutes for the lessors in the performance of the lessors' public duties. But the extent of the power vested in the majority may be obscured by overlooking the widely different origins of that power, and the distinction between the stockholders' private property which they did not receive from the state, and the public rights which they exercise as state agents. Eminent domain not being exercised over the plaintiffs' shares, it is necessary to observe the difference between that private authority over each share of the private property which its owner alone can give the majority, and that public agency which the public alone can give them.

The lease of the Northern to the Lowell is an attempt to compel the plaintiffs, dissenting stockholders of the Northern, to exchange for ninety-nine years all their interest in the Northern for an annuity, secured by a right of entry, practically equivalent to a mortgage enforceable by strict foreclosure. The possibility of a non-payment of the annuity, and a resumption of the carrier business by the Northern, has no bearing on the question of the validity of the exchange of that business for the annuity. This question is to be decided on the possibility and the presumption that the Northern will have no occasion to resort to its security. The circumstance that the money to be received by the Northern is, divided into many sums, due at different times, is immaterial. The law of the case is what it would be if the price paid for the estate of ninety-nine years had been paid in a single sum before the purchaser took possession of the road, and the security given were merely for the performance of covenants not relating to the payment of the price. The payment of the whole price in one sum, and the division of it among the Northern stockholders, would leave them members of their corporation and owners of an estate in remainder. Instead of being a step in a process of dissolving the Northern company and winding up its affairs, the lease requires that company to "keep up and preserve its organization." Whether each stockholder's share of the price of the estate sold is paid to him in one sum at one time, or in many sums at many times, the sale of the road for ninety-nine years is not a provision for the Northern company's working the road,

which by the terms of the sale is to be worked during that time, not by the Northern and the Lowell as joint principals, nor by the Lowell as agent of the Northern, but by the Lowell for the Lowell as sole principal.

" If the directors of the Concord Railroad should vote to build a line of telegraph on its road from Nashua to Concord, and stockholders should ask an injunction against the execution of the vote, one question would be, whether a telegraph line is reasonably necessary for working the road and carrying into effect the purposes of the charter. It would be largely, if not wholly, a question of fact." *Burke* v. *Railroad*, 61 N. H. 160, 244. But a vote of the directors and a majority of the stockholders to exchange all their corporate property for a telegraph line of equal value, and to change their business from that of a common carrier of persons and chattels to that of a telegraph company (the state waiving any objection it might make), would present no question of fact on which it could be held that a dissenting minority were bound. The telegraph business, taken in exchange for the railroad, could not be a mode or means of the Concord company's carrying on the railroad business, which, by the exchange, that company would abandon. On the question of incidental power, it would be immaterial whether the exchange were for ninety-nine years, or for all time. In many cases the question whether a proposed change would be an exercise of an instrumental power,—a power of carrying into effect the purposes of the charter, and accomplishing the objects for which the corporation was formed,— is a question of fact. Can the Northern company buy one coal mine or woodlot for the purpose of obtaining fuel for their own use, and another for the purpose of carrying on the business of a coal or wood merchant? Can they build one shop for the purpose of making rails, bridges, and rolling-stock for their own use, and another for the purpose of making them for market? Can they erect a station twice as large as they now need, if its erection is economical and judicious in view of the future demands of their increasing traffic ? When they have, judiciously or injudiciously, erected such a station, can they let half of it to a shoe manufacturer for three years, at the end of which time their railway business will probably require the whole ; or must they suffer the loss of three years' income of half because a stockholder denies their power to make a lease? Many questions of combined law and fact cannot be answered with legal precision until their component parts are separated, and the facts are found. As a matter of fact, is the proposed corporate act a mode or means of the company's carrying on their business of transporting passengers and freight on their road between Concord and Lebanon? However difficult this question may sometimes be, some progress is made towards an intelligent decision when we cease to be confused by a blended mass of law and fact in a general question of corporate

power, and begin to inquire what evidence there is on the question of fact. There is no evidence tending to show that, as a matter of fact, the lease of the Northern road is a mode or means of the Northern company's carrying on the business which, by the lease, that company abandon for ninety-nine years; and the law of the case is not the opposite of the fact.

"The transaction in question was a purchase by the one company of the good will and the whole concern of the other. That would, ordinarily speaking, be a transaction in which no company would be justified in engaging, because it certainly cannot be said to be within the ordinary scope of the object of any company to purchase the good will of another." "The principles of law upon which the liability of joint stock companies is to be decided, as far as is necessary for the decision of this case, are very clear and perfectly well settled, though not always in practice steadily kept in view. The law in ordinary partnerships, so far as relates to the power of one partner to bind the others, is a branch of the law of principal and agent. Each member of a complete partnership is liable for himself, and, as agent for the rest, binds them upon all contracts made in the course of the ordinary scope of the partnership business. . . . It is obvious that the law as to ordinary partnerships would be inapplicable to a company consisting of a great number of individuals contributing small sums to the common stock, in which case, to allow each one to bind the other by any contract which he thought fit to enter into, even within the scope of the partnership business, would soon lead to the utter ruin of the contributories. . . . The legislature, then, devised these companies, in a manner unknown to the common law, with special powers of management and liabilities, providing at the same time that all the world should have notice who were the persons authorized to bind all the shareholders, by requiring the copartnership deed to be registered, certified by the directors, and made accessible to all." *Ernest* v. *Nicholls*, 6 H. L. Cas. 401, 414, 417, 418, 419.

In an ordinary partnership, each member is an agent as well as a principal; his liability for the partnership debts is unlimited, and he cannot expose his associates to a new risk by transferring his agency to an assignee of his share. In this state any number of persons, however large, may form such a partnership; and however obvious the hazard arising from the number and character of the members, in each of whom an agency is vested, the law of ordinary partnerships is applicable to the firm. They may diminish the risk by conferring the agency (not upon each member, but) only upon a concurring majority, or upon a board of directors chosen by major vote, or upon one manager chosen by themselves or by directors. They may think this diminution of risk sufficient to allow a share to be sold and conveyed by a transfer of a certificate introducing a new partner. Even if a part or all of their

property is real estate, a statute can authorize this mode of conveyance, and make the shares personal property for the purposes of sale, pledge, attachment, levy of execution, descent and bequest, without incorporation. In many cases of common-law unincorporated partnership, the contract has provided for an unlimited succession and duration by making the shares transferable : without a dissolution of the firm, and without a termination of its agency, membership passed, with the shares of a living member, to his vendee, and with the shares of a deceased member, to his legatee, executor, or administrator ; and the general agency was vested (not in each member, but) in the majority of successive members, or a board of directors, or one manager, or in directors or a manager subject to such instructions as the majority of the successive members might see fit from time to time to give. *Tappan* v. *Bailey,* 4 Met. 529, 530, 536 ; *Tyrrell* v. *Washburn,* 6 Allen 466–468, 472, 474–476 ; *Skinner* v. *Dayton,* 19 Johns. 513, 539, 540, 557, 560, 563, 570. In a partnership contract, the members have called themselves stockholders. *Farnum* v. *Patch,* 60 N. H. 294, 295.'

Limited partnerships, formed for other purposes than banking or insurance, " may consist of one or more general partners, who shall be jointly and severally responsible, and of one or more persons, . . . who shall be called special partners, and shall not be personally liable for any debts of the partnership." G. L., *c.* 118, *ss.* 1, 2. By similar legislation operating prospectively, the liability of all partners can be limited to their partnership property, without (as well as with) acts of incorporation. The Northern Railroad charter provides that " This corporation shall hold and enjoy the privileges and franchises herein granted, subject to the laws in relation to corporations and railroads as they now stand in the Revised Statutes of this state." Laws 1844, *c.* 190, *s.* 10. The stockholders of an incorporated " company having for its object a dividend of profits . . . shall be personally holden to pay the debts . . . of such company, . . . in the same manner and to the same extent as though the stock were owned and the business transacted by the stockholders as unincorporated copartners." Rev. St., *c.* 146, *s.* 1. " There is no limitation . . . to the general liability of the stockholders to pay all the debts of the corporation, as set forth in the first section, if the proper steps are taken to charge them." *Chesley* v. *Pierce,* 32 N. H. 388, 400. In a limited partnership not incorporated, a special partner is not personally liable for any debts of the firm. By the Revised Statutes and the charter of the Northern Railroad, each member of that incorporated partnership was personally liable for all the debts of the firm. Under the subsequent modification of the personal liability law (G. L., *cc.* 149, 150 ; *Conn. River Savings Bank* v. *Fiske,* 60 N. H. 363), that company did not cease to be an incorporated partnership. Before the

liability of the stockholders was limited, they were joint principals in the business of a common carrier on their road between Concord and Lebanon, sharing the profits and losses of that business; and such principals are partners. *Farnum* v. *Patch*, 60 N. H. 294, 326; *Burke* v. *Railroad*, 61 N. H. 160, 243. Since their liability was limited, they have been joint principals in the same business, sharing all the profits and all the losses that have happened. They have shared all the profits and all the losses because they have been partners. They are partners, not because they share profit and loss, but because the business is theirs, and is carried on for them by their agents. *Eastman* v. *Clark*, 53 N. H. 276; *Parchen* v. *Anderson*, 5 Montana 438. Their partnership relation was not extinguished by the statutory limitation of the amount of loss they are liable to share. Whether incorporated or not, a partnership may be limited in respect to liability as well as agency.

The Northern Railroad, though not originally limited as to personal liability, was limited as to the number of partners authorized to act as agents of the firm. The management was vested in seven directors chosen annually. The business of the firm was their transportation of passengers and freight on their road between Concord and Lebanon; and the directors were made the agents of the firm for the transaction of that business. Laws 1844, c. 190, ss. 2, 3, 4, 5, 8. The majority of the firm having sold an estate of ninety-nine years in the property of which they and the objecting minority hold the equitable title, it is for the majority to justify the sale by showing their power to act for the minority. Of power passing directly from the minority to the majority, the defendants offer no oral evidence, and no written evidence but the charter. The partnership contract, written in the charter, makes no express mention of the majority; but when it provides that seven directors shall be chosen by ballot at the annual meeting of the stockholders, the meaning is that the choice shall be made by major vote. The directors "are authorized and empowered, by themselves or their agents, to exercise all the powers herein granted to the corporation, for the purpose of constructing and completing said railroad, and for the transportation of persons, goods, and merchandise thereon, and all such other powers and authority for the management of the affairs of the corporation, not heretofore granted, as may be necessary and proper to carry into effect the object of this grant." *Union M. F. Ins. Co.* v. *Keyser*, 32 N. H. 313, 315; *Bissell* v. *Railroad*, 22 N. Y. 258, 267. The lease is no stronger than it would be if the power thus expressly given to the directors were expressly given to the majority of the stockholders. The power given by the contract to the directors is the authority of an agent to act for his principals within the scope of his employment; and this authority is the same whether expressly or impliedly given to a majority of

the principals, or to seven or one of them. Its character and extent, and not the number of persons who can exercise it, is the material subject of inquiry. Whether the joint principals are called partners or not, the question of the validity of the lease is a question of agency. In the nature of things it is impossible for the majority of the stockholders to have any other authority to bind the minority by a contract than that of agents. The act of appointing the majority as agents of the minority is the act of the minority, and not the act of the state. It is not legislation. If it were, no appointment of any agent to do any business for any principal could be made by anybody but the state legislature, or some other law-making assembly. If the stockholders are regarded as a single corporate body, the result is the same. The majority are not that body, but merely a part of it, and agents of the whole so far only as the whole has given them authority.

As agents, the majority can do whatever is necessary to carry on, for their principal, the principal's business of a common carrier between Concord and Lebanon. Within limits, they can select the mode and means of executing their agency. The lease, instead of being a mode or means of their carrying on that business for their principal, transfers it to another principal for ninety-nine years, and transfers their principal to the vocation of a landlord and rent-receiver, which is not, in kind or degree, the same business as carrying passengers and freight. The legal scope of their employment is within the bounds of their principal's business, or, at most, those bounds and a proceeding for winding up that business, and dissolving their principal. If this limit of their agency were not the measure of their power, every one who becomes a member of a partnership, incorporated or unincorporated, in a business specifically defined and limited by the partnership contract, would thereby authorize a majority of the company (with a legislative waiver of public objection) to carry off his investment into all other business within the range of human capacity; and every one who employs an agent in any business for any purpose, however restricted by the contract of employment, would thereby empower him to bind the principal by any contract the principal could make in any other business for any other purpose.

When A employs B and C as his general agents in the cultivation and management of his farm (No. 1), he gives them an implied power to do what is necessary for exercising the authority expressly granted. They cannot sell the farm (Sto. Agency, *s.* 71). Their sale of it, compelling their principal to abandon the work he employs them to do, would not be a performance of that work. Evidence that his agriculture is unprofitable, or that, for any reason, a change of the investment would be judicious, would not prove their power of sale. His discontinuance of his farming business is a question he does not submit to them for decision.

They cannot sell and convey the farm for ninety-nine years, or for the shorter term of his natural life. Their general authority to carry it on for him, as his agents, is neither a power of excluding him, his heirs and assigns, forever from the business of a principal in carrying it on, nor a power of ousting three generations of owners. By making a lease, his agents would attempt to change his vocation from that of a farmer to that of a landlord. Employed by him in the cultivation of the soil, they would assume to embark him in a different business. A lease for ninety-nine years might be more embarrassing and disabling than a sale. With the cash proceeds of a sale, he could buy another farm which he might not be able to obtain in exchange for a right to collect rent. By a lease, his privilege of changing his investment might be seriously impaired. For many practical purposes, an unauthorized sale of his land for its value in money might be a less violation of his rights than an unauthorized lease for ninety-nine years. But the possible consequences need not be considered. The primary legal objection is sufficient. The express authority of B and C to carry on his farm for him does not include an implied authority to deprive him of its control, possession, and use. His appointment of them as his managing agents does not alienate his right to be the principal in the management, and does not confer the power of alienation on them, or on any branch of the government.

A sale or lease of the farm by B and C may not terminate its cultivation. They may become the agents of D, the purchaser or lessee, and carry it on for him. The same crops may be raised, the same stock kept, the same tools used, and the same work done. There may be no change in the character or extent of the business, and no other innovation than the substitution of D for A as the principal. But the validity of this exchange depends upon its being held that A's involuntary abandonment of his business is not, for him, a fundamental change of business, and that B and C can sell or let his farm, because a sale or lease will work no essential alteration in his legal and actual position as the principal in carrying it on. In an action brought by A against D to recover possession, the question of the agents' authority would be presented by a plea that the cultivation, continued by D, left A's calling substantially unchanged, and that A's agents carried on his farming business for him by transferring it from him to another principal. If the transfer were by a lease for ninety-nine years, the plea could also set forth the fact that a remainder is left in A which he can dispose of by a deed or will giving the grantee or devisee (his heirs and assigns) a right of possession and use at a remote period in the future. But A's dominion over his land, to-day, and during the remainder of his life, is a material part of his title. When the occupation is transferred to D by a valid lease, the lessee takes the land for the stipulated

term, and for a use that is either public or private. The legislature cannot authorize him to take it for a private use without A's consent. Against A's objection, D cannot be authorized to take it for a public use without a judicial ascertainment (Cool. Con. Lim. 563), and a prepayment of a sum of money equal to the value of what he takes. A conveyance of the land to him by B and C for a term of years at an annual, semi-annual, or quarterly rent, is not a provision for the prepayment of the judicially ascertained value of the whole term. On the question of the validity of the conveyance, it is not material whether the number of generations of evicted proprietors is three, or thirty, or one. The complaint that D has taken the land is not answered by the plea that he intends to keep it only ninety-nine years. This plea would disclaim any temporary or provisional arrangement rendered inevitable or reasonably necessary by circumstances. And if the question were, not whether D has taken the land, but whether he intends to keep it an unconstitutional length of time, it would be as difficult to hold that A would not be deprived of his property by taking it from him for a term of ninety-nine years, as to hold that he would not be deprived of his liberty by imprisonment for the same term. So far as the legality of his deprivation is concerned, he might as well be ousted by a perpetual lease as by one which leaves him a remainder so distant that, in the ordinary course of nature, for the usual purposes of ownership, the farm that was his will never be his again.

When A, B, and C are partners in the business of buying and carrying on another farm (No. 2), they are joint principals, and by fair implication, in the absence of express stipulation, each makes the others his agents for doing the joint business in the usual way, within the limits prescribed by the character of their enterprise. If B and C can bind A by an exchange of hay for a mowing-machine, and cannot bind him by an exchange of the farm for a saw-mill, it is because in the former case, by the exchange, the partnership business is carried on by B and C acting as principals for themselves and as agents for A, and in the latter case (aside from the law of real estate conveyance), the partnership business is not carried on, and therefore B and C are not exercising the power of agency given them by A. In their dual capacity, as principals, and as agents of A, they can do for the firm whatever is customary and necessary for the execution of the partnership contract, and the accomplishment of its object. Sto. Part., ss. 101, 102, 111–114; 1 Lind. Part. 236; *Kimbro* v. *Bullitt*, 22 How. 256, 264–268. If buying farms and selling them, or letting them for ninety-nine years, had been the business of the firm and the object of their contract, the power of agency would have been very different from that given by the formation of a partnership for the ownership, cultivation, and use of farm No. 2. *Anderson* v. *Tompkins*, 1 Brock. 456, 460; *Chester* v. *Dickerson*,

54 N. Y. 1. As the general agency of B and C in carrying on farm No. 1 for A as sole principal is not executed by their conveyance of the whole title, or a term of ninety-nine years, or a life estate, transferring A's business from him to another principal, so their agency for A as one of the principals carrying on No. 2 is not executed by their making a similar conveyance that substitutes D for A as a principal in carrying on that farm. In each case, the expulsion of A from the position of principal by his agents would be the opposite of what he authorized them to do.

The law does not require B and C to remain in the firm beyond the time stipulated in their agreement. Any member of an ordinary partnership, the duration of which is indefinite, may dissolve it at any moment he pleases, and it will then be deemed to continue only so far as may be necessary for the purpose of winding up its affairs. Even if its duration is defined, circumstances may arise giving a partner a right to have it dissolved before the expiration of the time for which it was originally agreed to last. A cause of its dissolution may be furnished by the misconduct or insanity of one of its members, the hopeless state of its business, or any circumstance by which its continuance, or the attainment of its object, is rendered practically impossible. 1 Lind. Part. 220, 222; 3 Kent Com. 53–62; Skinner v. Dayton, 19 Johns. 513, 538. For the purpose of paying debts, or avoiding bankruptcy, it may become necessary that the partnership business of A, B, and C should be terminated, and their farm sold by them or a receiver; but a sale of it to D, or a lease of it to him for ninety-nine years, cannot be necessary for the purpose of enabling the firm to carry it on as owners and principals under their partnership agreement. They may not be able to go on under that agreement without mortgaging the farm: the mortgage may be foreclosed; and a mortgage made indefeasible by strict foreclosure is an absolute deed. But the possible necessity of a mortgage for prolonging their business (Pierce v. Emery, 32 N. H. 484, 504) does not show that their power of carrying it on is exercised by an unnecessary deed or lease that instantly brings it to an end.

Their performance of their general contract for cultivation and management involves a frequent choice of methods. A great number of details, large and small, constantly await their determination. It is improbable that the partners will agree on all of them; and a requirement of unanimity might obstruct their operations, and even defeat the object for which the partnership was formed. There is, therefore, a reasonable inference of their intention that a minority, by mere dissent without dissolution, shall not control, impede, or prevent the performance of their contract, and that it may be performed according to the will of the majority. The power of a majority, whether expressed or inferred, is the power of an agent to act for his principal, and of

a principal to act for himself. A, B, and C are the firm, and agents of the firm. This is one form of the proposition that they are principals, and agents of each other. What shall they plant? What produce shall they sell? When shall they sell or buy anything, and at what price? What blacksmith shall they employ? Of what material shall they build a fence? If, between A and his copartners, he is bound by their decision of such questions; notwithstanding his dissent, it is because the questions decided are within the partnership jurisdiction, and his agreement that the farm shall be carried on by the firm for the firm makes his partners his agents, and authorizes a majority to control in the cultivation and management required by their contract. The implied agency of a majority to carry on that business for A, B, and C as principals, like the implied agency of one of them, is not exercised by a transfer of the whole business to D as lessee and sole principal for ninety-nine years.

The partners engaging in the business of carrying on farm No. 2 can rescind or modify their contract. They can abandon that business, lease the farm to D for ninety-nine years, and become mere landlords, receiving rent from the tenant who takes the place of principal in the business from which they withdraw. But the par' iership agreement, made by three, cannot be altered by one or tv ɔ. It is an agreement made by each one on one side, with the other two on the other side. Each is bound by his own contracting power, exercised by himself originally, or by himself or his agents afterwards. The agency of B and C to act for A in the execution of the partnership contract is not a power to alter A's agreement, or to make an alteration in the partnership business that would be a violation of the contract. .The business need not always be continued precisely as it is begun. Improvements required for its successful prosecution are ways and means supposed to be contemplated. But the contract to be performed until it is annulled or changed, is an agreement that the farm shall be carried on, not by anybody for anybody, but by the firm and for the firm, as principals. So long as that is the contract, the question of law raised by a lease to D for ninety-nine years against A's protest, is, not whether the transfer of the whole business from the firm to a different principal is judicious, nor whether a majority's violation of a minority's right is a custom and a public policy, but whether the transfer is a performance of the contract, or a violation of it. While all can unmake or alter the agreement which all make to carry on the business as principals, all cannot perform it by putting D as principal in their stead for ninety-nine years; and a change that is not performance when made by all, is not performance when made by a majority.

If the partners accept an act of incorporation containing the substance of their partnership articles, and convey their partnership property from themselves unincorporated to themselves

incorporated, the authority of B and C over A's share of the
farm is not increased, and their case is not altered in any particu-
lar that affects the validity of a lease for ninety-nine years made
by a majority against the objection of a minority. As owners of
farm-shares, B and C have a right of sale as a part of a process of
corporate dissolution (whether with or without judicial proceed-
ings we need not now inquire). This right of sale is not given them
by their agency in carrying on A's farm (No. 1). Their corporate
power to bind A by a lease of farm No. 2 for ninety-nine years,
like their authority to bind him by a lease of No. 1, is a question
of agency.

In 1804, thirty-one persons, including the two plaintiffs, became
partners in the publication of the "*British Press*" and "*Globe*"
newspapers, and agreed that the business should be managed by
a committee, chosen quarterly, and that the resolutions of the
majority of the partners present at all general meetings should be
binding on all. In 1807, the partnership "having been for some
time a losing concern," the whole property was sold in pursuance
of a resolution passed at a general meeting. The plaintiffs dis-
sented. All "except the plaintiffs acceded to the sale, and re-
ceived their shares of the purchase-money." It was held that the
majority could not sell the whole property; and the decree of the
Master of the Rolls against the purchasers, for an account of
the profits made and the losses incurred after the sale, was affirmed,
on appeal, by *Eldon. Chapple* v. *Cadell*, Jac. 537. Compare
the opinion of the same judge in the leading case of *Natusch* v.
*Irving*, Gow Part., App., 398, *ed.* 3. See, also, *Const* v. *Harris*,
Tur. & R. 496 ; 2 Lind. Part. 600–604. The agreement that a
committee should manage the business was held, not to mean that
the committee could transfer it to another principal by a sale.
The agreement that the resolutions of the majority should be
binding on all was held to mean resolutions as to the transaction,
and not a transfer, of the business. If the agreement had been
to engage in the purchase and sale of newspaper establishments,
the sale of the "*Press*" and "*Globe*" by the majority would have
been valid without the express stipulation as to the power of the
majority. The sale that would have been an act in execution of
a contract to carry on the business of buying and selling news-
paper establishments, was held not to be performance of the con-
tract to carry on the business of publishing the "*Press*" and
"*Globe*." When the firm had published those papers for some
time at a loss, and nearly all voted for a sale, it is not improbable
that the condition of the business was such that, on a bill in
equity, the law would have dissolved the firm, and would have
wound up its affairs by selling its property, paying its debts, and
dividing the residue of assets among the partners ; and if the
work of winding up would be as well and as safely done by the
majority as by the law, there may be a question whether equity

would interpose an injunction. But if the contract to carry on the partnership business of publishing the "*Press*" and "*Globe*" included an implied stipulation that the firm might be wound up by a majority, there was no inference of an agreement that a majority might make a lease of all the partnership property for ninety-nine years. By such a lease, the firm would neither carry on its business nor wind itself up. It is said that if partners intend the majority shall have power to wind up or sell the whole concern, the authority must be expressly given; for it cannot be inferred from the general language of a provision authorizing the majority to direct and regulate the concerns of the partnership. Sto. Part., s. 213; Coll. Part., s. 223. "Although general powers of management necessarily include power to sell in the ordinary course of business, such powers do not authorize sales of an unusual description, *e. g.*, a sale of the business of the company." 1 Lind. Part. 295. If a sale of the whole business, by a majority, for the purpose of winding up, is an exception to this rule, the exception does not include a lease by which the firm is neither wound up, nor allowed, for ninety-nine years, to do the work it agreed to do. *Colman* v. *Railway*, 10 Beav. 1, 14, 15; *Simpson* v. *Westminster Palace Hotel Co.*, 8 H. L. Cas. 712, 717, 718, 719; *Featherstonhaugh* v. *Lee Moor P. C. Co.*, L. R. 1 Eq. 318; *Ashbury, etc., Co.* v. *Riche*, L. R. 7 H. L. 653, 664, 665, 667, 668, 669, 671, 684, 687, 693; *Thomas* v. *Railroad*, 101 U. S. 71, 81; *Hutton* v. *Hotel Co.*, 2 Drew. & Sm. 521, 524, 525, affirmed on appeal, 11 Jurist (N. S.) 551; *Pickering* v. *Stephenson*, L. R. 14 Eq. 322, 340; *Ware* v. *Water Works Co.*, 2 Russ. & M. 470; *Davis* v. *Railroad*, 131 Mass. 258, 259; *Day* v. *Buggy Co.*, 57 Mich. 146, 150; *Lucas* v. *Transfer Co.*, 70 Iowa 541, 545, 546, 549, 550.

By a contract signed by about fifty persons, in 1839, the subscribers agreed to become partners in a firm to be styled the "Farmers' and Mechanics' Store," and to pay the sums annexed to their respective names, as the capital to be used by the firm in carrying on a retail trade in domestic and foreign goods at Bath. The twelfth article of the contract provided that there should be "neither purchase nor sale of ardent spirits by the concern." The business forbidden by this article was allowed by an amendment to which two of the subscribers (the plaintiffs in the reported case) did not assent; and it was held that they were not bound by the altered articles of partnership. *Abbot* v. *Johnson*, 32 N. H. 9, 19, 20. The plaintiffs did not pay the sums set against their names, and were discharged from liability by their rescission of the contract which the other parties had violated. If the violation had occurred after the plaintiffs contributed their shares of the capital, when mere rescission would not be a sufficient relief, they would have been entitled to an injunction against the purchase of spirituous liquor, or to a dissolution of the firm and a division of its

property, or to some other complete redress. They could not be compelled either to be partners in the business prohibited by their contract, or to sell their shares, but would have an adequate remedy in an appropriate suit. If the majority were dissatisfied with the twelfth article, they could sell their shares; but they could not put the plaintiffs to the alternative of submitting to the wrongful change of business, or withdrawing from the firm. Violations of the contract by the majority, before and after the plaintiffs paid their shares, would present different questions of procedure. But a material and unauthorized change of the business after they invested their money in it would be no less a violation of their legal right than a prior change; and their legal remedy would be no less effectual in one case than in the other.

The decision that the change of business was material and substantial, and that no dissenting partner was bound by the alteration of the twelfth article, was an ascertainment and adjudication of the original intention of the parties. If the twelfth article had required ardent spirits to be kept for sale under the license law then in force (*Pierce* v. *State*, 13 N. H. 536, 538), the contract would have been materially altered by a prohibitory amendment made by a majority of the firm; and a partner not assenting to such an amendment would not be bound by it. It might cut off the only branch of their trade in which he took any interest. His object might be a share of profit; and he might be of opinion that, at that time and place, without ardent spirits, there would be no profit. If the change were made before he paid his share of the capital, he could rescind his contract; if it were made after payment, he would have ample remedy by process of law adapted to the situation. Such an alteration of the twelfth article, or any other part of the agreement, as would not change its meaning, or affect any right or obligation of any contracting party, would be immaterial. *Smith* v. *Crooker*, 5 Mass. 538, 540; *Martendale* v. *Follet*, 1 N. H. 95–97; *Pequawket Bridge* v. *Mathes*, 8 N. H. 139, 141; *Burnham* v. *Ayer*, 35 N. H. 351, 354; *Cole* v. *Hills*, 44 N. H. 227, 232. Authorizing a large majority or a small minority to conform the business to a material alteration made by them in the contract is not legislation; and on the question of the validity of the alteration, it is not material whether the partnership is incorporated or not: in either case, the contract of fifty partners binds forty-nine of them as firmly as it binds one; and the contract of the fifty, that could be made only by the non-legislative power of all the contracting parties, can be materially altered only by the non-legislative power of all who are parties at the time of alteration. "The majority of the Farmers' and Mechanics' Store may alter the twelfth article of the partnership contract by accepting and exercising the power hereby given to that unincorporated company to sell ardent spirits; and the majority of the Northern Railroad may alter the partnership contract by accepting and

exercising the power hereby given to that incorporated company to lease their road for ninety-nine years." A statute in that form would not decide the judicial question of the materiality of the alteration of contract and business, but would present the question whether the twelfth article is performed by selling ardent spirits, and whether the partnership agreement of all the Northern company to carry on the business of transporting passengers and freight on their road is performed by a performance of the majority's subsequent agreement not to carry on that business from 1884 to 1983.

The immateriality of the mere incorporation of the partners, on the question of the power of the majority in this case, is settled in the case of a river-improvement company, decided by this court in 1817. *Union Locks and Canals* v. *Towne*, 1 N. H. 44, was a suit brought to recover assessments made by the plaintiffs on a share of their capital for which the defendant had subscribed. The plaintiffs' charter, passed in 1808, authorized them to render Merrimack river navigable from Amoskeag falls southward to Reed's Ferry, a distance of about eight miles, and for effecting this object to buy six acres of land, and to collect for forty years a toll not averaging over twelve per cent. on the capital invested. See 9 Granite Monthly 5, 6. In 1809 an additional act, passed on the plaintiffs' petition, repealed the limitations of the amount and duration of toll, and authorized them to buy one hundred acres of land instead of six. In 1812 another act granted to one Sullivan the right of locking Cromwell's falls, which were about six miles south of Reed's Ferry, authorized him to transfer his rights in this grant to the plaintiffs, and provided that " whenever such transfer shall be made, . . . this act shall be considered as an addition to the aforesaid act incorporating the proprietors of Union Locks and Canals." The transfer was made and accepted in 1813. The defendant did not assent to either of the changes of the company's powers; and it was held that the enlargements accepted by the majority of his associates were material alterations of the original enterprise and of the contract made by the company with its members, and that he could not be compelled to pay for the share for which he had subscribed.

The grounds of that decision are fully reported. The terms of the defendant's contract are limited by the charter. To make a valid change in this private contract, as in any other, the assent of both parties is indispensable. The corporation on one part can assent by a vote of the majority; the defendant on the other part by his own personal act. The defendant, having never assented to either of the additional acts, is under no obligations to the plaintiffs except what he incurred by becoming a member under the first act. Assessments made to advance objects essentially different, or the same objects in methods essentially different, from those originally contemplated, are not made in conformity to

the defendant's contract with the corporation; and the action, sustainable on that contract alone, cannot be supported. Assuming his membership, and regarding him as having made a purchase of a share under the act of 1808, the obligations imposed on him by that purchase were, to pay assessments made for the objects and under the restrictions contained in that act, and not to pay assessments made for other and more extended objects, or under different and fewer restrictions. Notwithstanding the laudable object and great utility of the additional acts, if they effected a material change, he is able to say *non hæc in fœdera veni*. The company's acceptance of the act of 1812 for locking Cromwell's falls effected a material change in the original corporation. It was, in fact, uniting two distinct corporations. After that acceptance the money assessed would be raised not only for the purpose first contemplated, of making the Merrimack navigable eight miles, from Amoskeag falls down to Reed's Ferry, but also for the purpose of making it navigable at Cromwell's falls,—a place six miles below Reed's Ferry, and wholly without the boundaries included in the first act. Neither the letter nor the spirit of the defendant's contract could extend to an object which was not originally within the contemplation and power of the parties. The amendment of 1809 does not vary the bounds of the river improvements, but it grants a material increase of corporate power. The additional acts are a variation from the contract originally made, and a variation, too, which reaches the essence of the contract. The defendant's assent to amendments extending the objects or increasing the powers of the corporation is not to be presumed, but must be expressly shown.

On these grounds it was held that he was not engaged in the new enterprise of locking Cromwell's falls, or the new enterprise of buying one hundred acres of land instead of six, and collecting a toll unlimited in amount and duration instead of one not exceeding twelve per cent. for forty years. He was not bound by the votes of the majority enlarging the power he had given them over his share of the corporate property. The amendments of the charter were a waiver of the public objection to an enlarged area of corporate power; but as he was bound by nothing but his own contract as to the authority of the majority to act for him as his agents within the original area, so he could be bound by nothing but his own contract for an extension of that authority. The decision and the reasons on which it was based are affirmed in *March* v. *Railroad*, 43 N. H. 515, 525, 526, 532, 533. The doctrine of agency, thus applied, has been maintained in this state seventy years, and there is no legal or equitable principle on which it can be overturned.

If the defendant in *Union Locks and Canals* v. *Towne* had paid his share of the capital before the passage of the act of 1809, his rights would have required some other remedy than a defence in

that suit. *March* v. *Railroad*, 43 N. H. 515; Cook, Stockholders, *s.* 502. His agents could gain no legal advantage over him by postponing the enlargements till he paid his share. In the absence of other adequate remedy, his rights could be maintained by writ of *mandamus*, or other process from the common-law jurisdiction that superintends all civil corporations. 3 Bl. Com. 42; 1 Bl. Com. 470, 471; High Ex. Rem., *c.* 4; *Boody* v. *Watson*, 64 N. H. 162, 170–173; *Boston, Concord & Montreal Railroad* v. *State*, 32 N. H. 215, 230, 231.

If the works of the Union Locks and Canals had been constructed within the bounds of the charter, and the fact had then been found that the investment would be wholly lost unless they opened communication with the Middlesex canal by locking Cromwell's falls, or that the extension was necessary to accomplish the purposes of Towne's contract, the question might have arisen whether, on that point and to that extent, the case came within the implied power of doing what was necessary for carrying those purposes into effect.

Neither in that case nor in this was a legislative reservation of a power of altering and repealing the original legislative grant necessary to enable the senate and house to make an additional grant of corporate power which the grantees could accept or refuse to accept. The meaning of such a reservation in a charter is an undisputed historic fact. Its only purpose and effect in the charter of the Northern Railroad is to enable the legislative grantors to revoke, wholly or partially, conditionally or unconditionally, their grant of legal rights to that company; that is, to alter the grant in some other way than giving them more rights which they can accept or reject. The reservation enables the legislature to exercise the legislative power of revocation without the consent of the stockholders, and against their unanimous opposition. All legislative power except that of revocation can be exercised without the reservation. By New Hampshire law the charter being, on the part of the state, a repealable statute, and not a contract, the reservation is not necessary for any purpose. By federal law, as construed by the federal court, it is necessary for the purpose of retaining the power of total and partial repeal. So far as federal construction makes the charter a contract of the state as well as a law, it would, if unqualified, introduce the evil of an irrepealable legislative act. By the reservation, the senate and house continued to hold that rescinding portion of their power which, in the opinion of the federal court, they would have lost if they had not expressly retained it. By the act of incorporation, qualified by the reservation, they lost no power and gained none. With the reservation, for all the purposes of this case, they have the whole of the supreme legislative power vested in them by the second article of the constitution; and they can exercise the whole of it as well without a vote of the stockholders, or against their unanimous objection, as with their

unanimous assent.   And if all contractual power were legislative, it would follow not only that the senate and house can make any agreement between those stockholders as to what business they will undertake, but also that the members of a legislative body, acting in their official capacity, are the only persons legally competent in this state to make that or any other contract.

The grant of leasing power to the Northern company, like the grant of other powers in the charter, being ineffective until accepted by the grantees, is not an alteration of the partnership contract.   As the grantees made every granted power a part of that contract when they accepted the charter and thereby made it the evidence of their agreement, so they alter the contract by inserting in it every other power which they afterwards accept. The grant of leasing power is an enabling act.   It legalizes their alteration of their contract, and their exercise of the new power when their acceptance of it has made it theirs.   On the question whether it has been granted and accepted, it is immaterial whether, when accepted, it is to be exercised by two thirds, or a majority, or one of the partners.

Any and all of the corporate powers granted to the stockholders by the state can be taken from them by the grantor.   The rescission of the entire grant, or any part of it, may be unconditional. A repeal of the provision that the stockholders may sue and be sued as one person would impose upon them and the public an inconvenience that would be serious, if it could not be mitigated by the company or by the common law.   A repeal of the requirement that the stockholders shall choose seven directors would remove a disability, and enable the stockholders to exercise the common-law right of agreeing upon an election of any number of directors or none.   It is not for the grantees to say that the revocable grant shall not be amended.   A legislative revocation of granted powers may be accompanied by a proviso that the grantees may retain them in a modified form.   This is merely saying that the grantor can grant, and the grantees can accept, new powers instead of the old ones.   The principle is the same whether the new powers are substitutes or additions.   Without acceptance, they cannot become the powers of the grantees.   An act repealing the Northern charter, unless the stockholders accept a new power of leasing the road, would enable an objecting owner of one share to injure himself, and the other stockholders, and the public.   The expediency of refusing to take the objector's share by an easy and harmless legal process that would pay him for it, is not a judicial question.   If an amendment of the charter law can authorize a conveyance of one stockholder's share of the property by a lease for ninety-nine years without his consent, and without prepayment of the value of his share, another amendment of the same law can convey all the property to a bankrupt and his heirs and assigns forever without the consent of any of the owners, without

payment of anything at any time, and without any security for payment. If either amendment would be an exercise of legislative power, no private property, real or personal, can be leased, loaned, or sold by its owner until an amendment of the constitution gives him a portion of the legislative power now vested in the senate and house.

A manufacturing company having been incorporated in 1833, a statute of 1839 made the stockholders liable for corporate debts contracted after its passage, and a stockholder was held liable for a debt contracted in 1841. *Stanley* v. *Stanley*, 26 Me. 191. The court say, "If the corporators were not satisfied with their individual liabilities, . . . they had it in their power to cease incurring them." The partners could alter their charter contract of partnership by continuing in business after the law of individual liability was changed by the act of 1839. They could avoid an alteration of that part of the contract relating to liability by winding up the company. One of them, objecting to the alteration of his agreement, would be entitled to an injunction against the contraction of debts, or a legal process of dissolution, or some other adequate protection. None of them could prevent the change of the charter law on the subject of individual liability, and none could be compelled to become liable under a new law.

In 1846 a revocable power of New York banks to issue bank notes was conditionally revoked. The condition was, that if any bank continued to issue notes after January 1, 1850, the stockholders should be individually liable, to a certain amount, for corporate debts contracted after that date. Time was given " to enable the proprietors of existing banking institutions to determine whether they would remain banks of issue, and assume the burden of individual liability, or avoid that consequence by winding up their affairs, or confining themselves to other branches of banking." All the stockholders of a bank, by continuing to issue notes after January 1, 1850, accepted the condition as an alteration of their contract. *Lee's Bank*, 21 N. Y. 9. In such a case in this state, a stockholder, seasonably objecting, would be entitled to an injunction against a continued issue of notes by his firm that would materially alter the partnership agreement concerning liability.

In *Union Locks and Canals* v. *Towne*, the amendatory legislation of 1809 and 1812 was an additional grant of corporate power to the company. The provision of *s.* 17 of the act of 1883, that " any railroad corporation may lease its road," is an additional grant of corporate power to the Northern Railroad company. In each case the acceptance of the additional grant would be a material alteration of the charter contract of partnership. In each case the additional as well as the original grant, like an ordinary deed of land, power of attorney, or official appointment, is permissive, not obligatory, and has no effect until accepted. The stock-

holders' acceptance of the leasing power granted to the Northern Railroad in the act of 1883 would have the same effect as their acceptance of the same power if it had been granted in their act of incorporation. By becoming a member of the company, every stockholder accepts the charter-grants of 1844. As the plaintiffs have not accepted the grant of 1883, and have not authorized their agents to accept it for them, the corporation, of which they are a part, have not accepted it. It can be accepted directly by a unanimous affirmative vote on the general question of acceptance. A unanimous vote in favor of a particular lease would be a bar against a stockholder's contesting that lease on the ground of a want of leasing power, and might be claimed to be an indirect general acceptance. Had the leasing power become one of the corporate powers by acceptance, it could be exercised at any time "upon such terms and for such time as may be or may have been agreed to by the directors, and as may be or may have been approved by two thirds of all the votes cast on that subject by the stockholders," according to the express provision of the grant. As the directors and two thirds of the stockholders voting on the question of acceptance are not the corporation, but only a part of it, and can have no other power than that of agents to act for anybody but themselves, the construction that the leasing power granted to the company can be accepted for the company by the directors and two thirds of the voting stockholders would make the grant a legislative attempt to give the company's agents a leasing power over the corporate property and business which those agents cannot give themselves, and which their principals have not given them. The only conclusion in favor of this construction is, that the power of giving any agents any control over their principals' property or business is legislative in its legal character, and, being legislative, can be exercised by nobody but legislators in whom the constitution vests it. And this would fall far short of the whole conclusion. An agreement of two parties, giving one of them authority to act for the other, is but one of an infinite number of possible contracts. If the power of making a contract of agency between these plaintiffs and other stockholders is legislative, all contractual power is legislative. A decision sustaining this lease would change the private right of making contracts into a public right, take it from all private companies and private persons who now have it, and bestow it exclusively upon those who have the constitutional power of making law.

The contract made by the stockholders of the Union Locks and Canals with each other, and by the stockholders of the Northern Railroad with each other, and written in the charters of those companies, could have been so written as to authorize the directors, or a majority of the stockholders, or two thirds of them, or each of them, or one of them specially designated, or any other person,

acting as agents or agent of the company, to take the company, with the state's permission, into any and all business that men are capable of doing. In neither case is there such a contract, express or implied. In neither case is there a stipulation, express or implied, that a majority, or any other part of the company, may put the shares of the rest into any business except that specifically described in the contract, and any other that comes within the incidental power of doing what is reasonably necessary to enable the company to do that business.

In the present inquiry, it is not material whether the effort of a partnership majority to alter the partnership contract is made directly and in express terms, or indirectly by an acceptance of corporate power. A vote of the majority of the Farmers' and Mechanics' Store accepting a charter authorizing the firm to buy and sell ardent spirits, would have been as unavailing against the twelfth article, as the vote amending that article without an act of incorporation. A material alteration of the partnership contract of the Northern Railroad effected by an acceptance of corporate power, or in any other way, being an exercise of authority which that contract does not confer upon the majority, is not validated by circuity of method. "The directors of the Northern Railroad and two thirds of the voting stockholders of that company may accept, for themselves and the other stockholders, the grant of leasing power hereby made to that company." Such a clause, in the act of 1883, would have been inserted on the theory that the directors and two thirds of the voting stockholders were thereby made state agents whose services could be dispensed with by enacting that "The leasing power, hereby granted by the state to the Northern Railroad, is hereby accepted by the state for that company." Either clause would present the claim that all contractual power, including the right to make and alter partnership agreements, is legislative, and therefore in every valid contract the state is both parties.

"It is an admitted principle, that in partnerships and joint stock associations they cannot by a vote of the majority change or alter their fundamental articles of copartnership or association against the will of the minority, however small, unless there is an express or implied provision in the articles themselves that they may do it. . . . It is conceded that there is a class of alterations in a charter which the corporation may obtain and adopt, that would not so essentially change the contract as to absolve the corporator from his subscription, or give him a right to complain in a court of justice in case he had previously paid it. Where the object of the modification or alteration of the charter is auxiliary to the original object of it, and designed to enable the corporation to carry into execution the very purpose of the original grant, with more facility and more beneficially than they otherwise could, the individual corporator cannot complain; and I should apprehend it would

make no difference with the rights of a corporation in such a case, though he could show that the charter, as amended, was less beneficial to the corporators than the original one would have been. The ground upon which such amendments bind the corporator, I deem to be his own consent. When he becomes a corporator by his signing for a portion of the capital stock, he in effect agrees to the by-laws, rules, and votes of the company, and there is an implied assent, on his part, with the corporation, that they may apply for and adopt such amendments as are within the scope, and designed to promote the execution, of the original purpose. . . . The consent or assent may . . . be implied where the amendment is not regarded as fundamental, and can be brought within the scope of the original purpose of the association. . . . It is not necessary that the business should be changed in kind to change the original purpose. If this [a railroad extension of thirty miles] is not a change in purpose, it would not be to extend the road in one direction to Canada line, and in the other to Massachusetts line." *Stevens* v. *Railroad*, 29 Vt. 545, 550, 554, 555.

The proposed extension was held to be a change of the original purpose, and a violation of the stockholders' contract. The statement, in the opinion, that the majority may obtain and adopt an amendment of the charter making any change in the minority's contract that is not essential or fundamental, is explained by the context. As explained, it means not that the majority can thus make a change in the contract that would be a violation of it, but that when the company need the state's assent to corporate action that is within the express or implied power of doing what is necessary to carry into effect the specified purpose of the contract, the majority may apply for and accept an amendment giving such assent; in other words, the majority may accept a legislative increase of the legislative grant of corporate power that will enable the company to perform the stockholders' contract. *Hanna* v. *Railroad*, 20 Ind. 30. Under this exposition of amendments that are not essential or fundamental, their legal effect and practical utility need not now be considered. Whatever explanations the statement concerning them may require in the various forms in which it occurs in the books, it cannot divert attention from the central point of inquiry. Under all versions of sound doctrine, the question in this state is, whether the change which the majority propose to make in the corporate business, against the objection of the minority, is a performance of their contract, or a violation of it, and not whether, in fact, the violation will probably be beneficial, nor whether, in fact or in law, it is so small or so enormous as to be approved or condemned by an arbitrary and boundless discretion. On the facts of this case, a leasing violation of the minority's legal right, however beneficial to them, is a legal cause of action on which they are entitled

to judgment in some form of action. *Johnson* v. *Conant,* 64 N. H. 109, 136.

"A corporation, like a partnership, is an association of natural persons who contribute a joint capital for a common purpose. . . Changes in the purpose and object of an association . . . are necessarily fundamental in their character, and cannot, on general principles, be made without the express or implied consent of the members. The reason is obvious. . . . The purpose and object . . . may be said to be the final cause of the association, for the sake of which it was brought into existence. To change this without the consent of the associates would be to commit them to an enterprise which they never embraced, and would be manifestly unjust." *Chicago City Railway Co.* v. *Allerton,* 18 Wall. 233, 235. Compare *Lauman* v. *Railroad,* 30 Pa. St. 42; *Clearwater* v. *Meredith,* 1 Wall. 25, 39, 40, 41; *Nugent* v. *Supervisors,* 19 Wall. 241, 248, 249; *Atlantic & Gulf Railroad Co.* v. *Georgia,* 98 U. S. 359, 364; *Sargent* v. *Webster,* 13 Met. 497, 503, 504; *Treadwell* v. *Salisbury Mfg. Co.,* 7 Gray 393, 394, 397, 398, 404, 405. The retirement of the Northern company from the industrial activity of common carriers to the leisure of mere rent-receivers was a change in the object of the partnership. The legal character of the change did not depend upon the circumstance that the partners never intended to perform all their mental and manual labor in person. The labor now done and the tolls now received on the road are not theirs.

" . . . Because the corporators may, with the consent of the state, by the vote of a majority or two thirds in interest, abandon their enterprise, sell out their property, and return his share of the proceeds to each stockholder, it does not follow that by the same authority the works may be leased to be carried on and conducted by others, the corporation continuing to exist. The right to elect the directors, by whom the business is to be managed, is a provision in the charter which the state or a majority cannot interfere with; it is a contract. The true question on that point here is, whether the making of this lease and contract is an exercise of the power of managing the business and concerns of the corporation conferred in the charter, such as can be used by consent of a legal majority of corporators, without that of all." *Zabriskie,* Chancellor, in *Black* v. *Canal Co.,* 22 N. J. Eq. 130, 407. See, also, 22 N. J. Eq. 405, 408, 415, 416; *Zabriskie* v. *Railroad,* 18 N. J. Eq. 183.

" The certificate for stock declares that the holder is entitled to a certain number of shares of the capital stock, which consists of the corporeal works and property, with valuable franchises to be used by the corporation for their profit, by the taking of tolls and fares, with the right to acquire and dispose of such property as may be essential in the legitimate exercise of their functions, under the management and control of directors, of whom any cor-

porator, by and with the consent of the requisite number of his associates, may be one. The prospect of increased gains consequent upon the growth of population and added business is a valuable incident also to the ownership of the stock. Such are the rights vested in the stockholder under the law, and by virtue of his engagement with his associates, before the lease is effected. After the lease takes effect, his company is denuded of all these corporeal, substantial properties, its structure for the next 999 years is totally altered, and instead of what he before possessed he would be compelled to accept an annual rent. . . . The shareholder would still have the paper upon which his certificate is printed, but in place of the earnings he must be content with a share of the reserved rental in a corporation possessed of the single faculty of maintaining its organization for the distribution of such rent, stripped of all the franchises for the exercise of which it was founded. Without his consent, and against his protest, he would lose his share in the old thing, and be forced . . into a new and wholly different venture. . . . For all substantial, practical purposes, a lease for 999 years is a conveyance in fee." *Van Syckel*, J., in *Black* v. *Canal Co.*, 24 N. J. Eq. 455, 464, 465.

"From the conclusions thus far reached, does it result that one unwilling stockholder may obstruct the growth and development of every enterprise of this character in which he may have participated, and thus hinder the union under one management of these important public highways, which have been constructed at different periods and under separate charters, when the necessities of interstate commerce and the convenience of public travel may unite in urging it? Shall a railroad from Philadelphia to Trenton never be extended so as to connect the two great cities of our Union while one obstinate associate stands in the way? . . . In the exercise of the right of eminent domain, the legislature may authorize shares in corporations, and corporate franchises, to be taken for public uses upon just compensation." *Van Syckel*, J., in *Black* v. *Canal Co.*, 24 N. J. Eq. 455, 468;—see, also, 24 N. J. Eq. 463, 466, 467, 485.

In the frequent comments which have been made upon the Dartmouth College case,* it has been quite common to discuss the matter,—first, as if the sole question were whether a charter is revocable; and second, as though the interests of corporators, if not protected by the federal constitution, were not protected at all. But if the counsel for the college were correct in their contention, the acts of 1816 were much more objectionable than an act simply repealing the charter. Those acts, in their view,

---

* For the reasons which induced this elaborate discussion of the Dartmouth College case, and as to the proper place of this discussion in the present opinion, see note at beginning of the opinion.

not only abolished the old corporation, but also gave its property to a new one. The question involved not merely the power to revoke the charter of a corporation, but the much more dangerous power to confiscate its property. The counsel for the college, having an eye to the immediate interests of their clients, and probably fearing that the legislature might pass a simple repealing act, appear to have argued the case upon the assumption that the two powers must stand or fall together. They deny the existence of either power; but they do not seem to deny that if the legislature could revoke the charter, they could also dispose of the corporate property at their pleasure. It is now the settled doctrine, in the federal and other jurisdictions, that corporate dissolution does not take corporate property from its equitable owners. Under this modification of the ancient rule, the extinction of the college corporation by a repeal of its charter would not be as important as it was understood to be in 1819. The conclusion reached in the following notes is, that a corporate charter is not a contract within the meaning of the federal constitution, and is revocable; that a repeal of the college charter would not divert the college property from the uses for which it is held in trust (the law not allowing the trust to fail for want of a trustee); that both courts were wrong; that the state court erred in holding that the acts of 1816 were not in violation of the state constitution; and that the federal court erred in holding that the federal constitution prohibited a repeal of the charter.

The members of public corporations "have no private beneficial interest either in their franchises or their property. . . . A gift to a corporation created for public purposes is in reality a gift to the public." The trustees have no "private interest in the property of this institution,—nothing that can be sold or transferred; that can descend to their heirs, or can be assets in the hands of their administrators. If all the property of the institution were destroyed, the loss would be exclusively public, and no private loss to them. . . . Nor is it any private concern of theirs whether their powers as corporators shall be extended or lessened. . . . If such a corporation is not to be considered as a public corporation, it would be difficult to find one that should be so considered. . . . These trustees are the servants of the public, and the servant is not to resist the will of his master in a matter that concerns that master alone. . . . If the private rights of founders or donors have been infringed by these acts, it is their business to vindicate their own rights; it is no concern of these plaintiffs. When founders and donors complain, it will be our duty to hear and decide; but we cannot adjudicate upon their rights till they come judicially before us. . . . The officers and students of the college . . . are not parties to this record, and cannot be legally heard in the

discussion of this cause. . . . The real question then is, Do these acts unconstitutionally infringe any private rights of these trustees? . . . The legal identity of a corporation does not depend upon its being composed of the same natural persons, and . . . an addition of new members . . . cannot . . . make it a new and different corporation. . . . Nor, by the addition of new members, is any part of the legal title to the corporate property transferred from the old to the new members. The title remains unaltered in the corporation, . . . and the beneficial interest in the public." *Trustees of Dartmouth College* v. *Woodward*, 1 N. H. 111, 117, 119, 120–125. (The case is also reported, with the arguments, in 65 N. H. 473.) So say the supreme court of New Hampshire, speaking through Chief Justice *Richardson*, in their decision of the case.

The preservation of the rights comprised in the equitable title is the purpose for which the donors conveyed the legal title and perpetual powers to the trustees. While the conveyance vested nothing in the trustees for their private benefit, it imposed obligations which they cannot lawfully neglect. With the legal title, they accepted the powers and duties attached to it by the original owners. Their office is the position the donors would occupy if living, and holding the property under a valid and irrevocable declaration of the same trust. By accepting that position the trustees became, for many practical purposes and in a large legal sense, the representatives of the donors and the beneficiaries. One reason for making the trust perpetual was, that the time would come when the donors could not administer their own charity, or go into court to defend the legal title, or complain in behalf of the numerous and unorganized body of equitable owners whose interests might need protection. If the trustees held the equitable title, they could waive rights which they are now bound to maintain by a diligent use of their power (not omitting any necessary resort to legal process), as a guardian is bound to care for the rights of his ward. Their lack of private, beneficial interest, and the separation of the equitable from the legal title, do not weaken their legal title, nor affect their power and duty of holding and maintaining their right to hold the property for the benefit of the equitable owners whose protectors they are.

An executor's lack of beneficial interest would not prevent his contesting the validity of a statute appointing two additional trustees to act with him, and conveying to them two thirds of his title and power. Notwithstanding his lack of personal interest, he could act for those whom he represented, and could assert their right against the statute that would be not a valid enactment, but invalid administration. A termination of his office by a repeal of law would not make the appointment of his successor a law-making act. If a repeal of the college charter would create an official fiduciary vacancy, and leave no one in possession of the

legal title of the college property, it would not destroy either the legal or the equitable title, and would not give a legislative character to the act of filling the vacancy, or to the act of conveying the property. The right of conveyance, like the rest of the rights which constitute ownership, does not belong to the state, and cannot be exercised by the state as owner, nor by those legislative agents of the state who can convey the state's property but cannot exercise all rights of ownership over all property of which the state is not the owner.

The rule placing "natural persons and corporations precisely upon the same ground" of general liability to legislative control, is "the only one upon which equal rights and just liabilities and duties can be fairly based." *Thorpe* v. *Railroad*, 27 Vt. 140, 145. A railroad corporation is "put in the same position a natural person would occupy if engaged in the same or like business. Its rights and its privileges in its business of transportation are just what those of a natural person would be under like circumstances; no more, no less." *Stone* v. *F. L. & T. Co.*, 116 U. S. 307, 329. This is an application of the equitable principle that the corporate fiction does not operate beyond the purpose of its introduction. It neither increases nor diminishes legislative control of natural persons, their legal titles or equitable interests. The theory, that an amendment of the Dartmouth charter enlarging a minority of the corporation into a majority by an appointment of nine additional members does not convey any part of the property or fiduciary power, and does not affect the legal title of the trustees or the beneficial interest of the students, because twenty-one trustees are the same imaginary being as the twelve, is an application of the error that subjects corporate property to double taxation. The error is an illimitable expansion of the corporate fiction, subjecting natural persons to an impairment of their contracts and an invasion of their legal titles and beneficial interests.

All the legal advantages of individuality desired for a collective and changing body of twelve trustees could have been bestowed upon them by the provincial legislature, as well without as with resort to the imagination for the creation of a non-natural person. Incorporation was not necessary for their succession, their exemption from personal liability for the payment of judgments, or their unity in litigation and the service of process. As natural persons, under special or general statute, they could have had succession, exemption, and every benefit of corporate personality. The employment of fiction for this purpose neither subjected them to, nor exempted them from, the exercise of legislative power. So far as the question of power is concerned, it is immaterial whether the object of incorporation was accomplished by incorporation or otherwise. The irrelevancy of the fiction was distinctly asserted by the two members of this court who decided the case (the docket

shows that Judge *Woodbury*, who was one of the nine new trustees, did not sit), when they declared it to be their duty, in determining the rights in controversy, to "look beyond that intangible creature of the law, the corporation, which in form possesses them, to the individuals, and to the public, to whom in reality they belong, and who alone can be injured by a violation of them." *Trustees of Dartmouth College* v. *Woodward*, 1 N. H. 120. The only rights in controversy were the ownership and control of the college property.

Vague and exaggerated ideas were (and still are) entertained of the utility and necessity of incorporation under a general or special law, and of the damage resulting from a repeal of that law. Chief Justice *Marshall* said (*Trustees of Dartmouth College* v. *Woodward*, 4 Wheat. 518, 637, 642),—"In most eleemosynary institutions, the object would be difficult, perhaps unattainable, without the aid of a charter of incorporation. Charitable or public-spirited individuals, desirous of making permanent appropriations for charitable or other useful purposes, find it impossible to effect their design securely and certainly without an incorporating act. . . . An artificial, immortal being was created by the crown." An intangible, invisible being, possessing no mental, moral, or physical capacity (*Sutton's Hospital Case*, 10 Rep. 32 *b.*; *Tipling* v. *Pexall*, 2 Bulst. 233; *Bissell* v. *Railroads*, 22 N. Y. 258, 266), may be a convenient figure of speech; but the true view of legal principles is to be found in the region of realities, where the college corporation is no other person or creature than the consecutive body of twelve men, who were not created by the crown, and who could hold and manage the college property without a charter, in the exercise of the common-law powers of trustees appointed by deeds or wills. The charter was an amendment of the common law,—an act of special legislation, restricted in its operation to a single trust. The statute of limited partnerships (G. L., *c.* 118) is a general act of legislation. It alters the common law in relation to special partners. Being mere legislation, it is repealable, as it would be if it were a special act applicable to one firm only. In what respect, of any importance in the college case, does the Dartmouth charter differ from the statutory regulation of the rights and liabilities of a special partner?

The founders of Dartmouth college desired to put some of their private property in the hands of twelve agents, called trustees, who should be bound to perpetuate the succession and identity of their agency by exercising their elective power of filling vacancies, and bound to apply the trust-fund according to the donors' lawful directions. It is useful to consider what material part of the plan could not have been as well accomplished by wills or trust-deeds containing the essential provisions of the charter, without an incorporation of the agents; what alteration was

made by the sounding phrases of the royal grant; for what purpose was a corporate fiction necessary; what was gained by its acceptance; and what harm would be done by a valid repeal of the charter, terminating the existence of the mythical being created by the crown. What difference is there in the effect of the charter or the effect of its repeal, whether the power of perpetuating the fiduciary body by appointment is in that body, as in the case of the college and the case of an ordinary academy (*Sanderson* v. *White*, 18 Pick. 328, 329, 336), or in other ecclesiastical and political bodies, as in the case of Elliot Hospital (*Chandler* v. *Batchelder*, 61 N. H. 370, 371), Laws 1881, c. 178, or in a judicial tribunal, as in a multitude of other cases? Sto. Eq., ss. 1060, 1287; Ad. Eq. 36, 61; *Schouler, petitioner*, 134 Mass. 426; *School District* v. *Concord*, 64 N. H. 235. These are vital. questions. They require an analysis of the charter, and an understanding of the distinction between its repealable law and its irrepealable contract. They lead the inquirer away from the fanciful and false theory of an implied governmental promise that the legislature shall not exercise their power of repealing the charter law, to the express charter stipulations of donors intrusting the legal title, possession, and management of property to twelve trustees, and the agreement of the successive donees (lawfully appointed and accepting the trust fund and its accompanying agency), remaining to be performed as long as a remnant of the property can be found.

A valid repeal of the charter would show how much of it is law, made in 1769 by the king, and how much of it is evidence of contracts made at different times by the donors and donees of the property. The charter conveyed no property from the king, and its rescission would annul no conveyance or gift of property and destroy no title. After a legislative revocation, judicial forfeiture, or voluntary surrender of the corporate powers and existence of the Orphans' Home, Laws 1871, c. 98, the Franklin Street Society, 60 N. H. 342, and the Amoskeag Manufacturing Company, their work, continued by unincorporated trustees or partners on the same premises, would be as lawful as if no corporate franchise had ever been granted. The educational substance of the college is no more destructible or pervertible than it would be if no corporate franchise had been accepted by the trustees. The college property is no more and no less secure than it would be if the trustees had never been incorporated. On the question of its constitutional security and the constitutional inviolability of the contracts which devote it to the uses of the college, nothing is more immaterial than incorporation of the trustees.

If the charter had conveyed to the trustees an acre of the king's land, the property thus conveyed would have ceased to be the king's, and would not have passed from him to the state; and the

state's conveyance of it without payment of its value, and without legal process, like a conveyance of any other property not owned by the state, would not be an enactment of law. As holders of the legal title and representatives of the equitable proprietors, the trustees could sell the land, because a sale would be an exercise of the owner's right, and would not be legislation. For the same reason, with or without a repeal of the charter, the state could not give the land to others, or exercise the owner's right of sale. The trust fund passed to the trustees from the donors, both parties assenting to the charter as evidence of a contract executed on the part of the donors by their conveyance of title and powers, but executory on the part of the donees during the existence of the fund. The evidence and obligation of this contract would remain unimpaired after the repeal of all the law made by the grant of the charter, and after the extinction of the imaginary being fabricated by the trustees' acceptance of that grant.

If the college trust had been established in 1769 by the private contract of a deed without a charter, and the property had been left, by death or resignation, in 1869, without a manager, the trust would have been sustained by an appointment of trustees. The law would have made the appointment on grounds of a strictly judicial nature; for a strictly legal cause, stated in writing with legal certainty, made a public record, and maintainable on demurrer; for the sole purpose of accomplishing the donors' design, proved by competent evidence; and after all interested parties had an opportunity for a fair trial, to which they would not be entitled in law-making procedure. The law would have done this through the agency and by the decree of a tribunal liable (as the legislature is not) to impeachment for partiality, corruption, or any intended wrong in the discharge of the duty of carrying into effect the legally proved intention of the donors. If every vacancy in the unincorporated board of trustees had been filled by the surviving members for a hundred years, in execution of the contract of 1769, and the board had unanimously accepted a charter in 1869, their mere incorporation would not have changed the school or the fund. Their contract, made by the grantor's delivery and the grantees' acceptance of the deed and property, would have remained to be perpetually performed by the grantees. Their change from an unincorporated to an incorporated body would not have affected the continuous fiduciary powers conveyed with the property by its grantors to its grantees, or the grantees' continuous duty of holding and applying the property in performance of an obligation as contractual as that of a devisee who accepts land charged, by his testator's order, with the payment of a legacy. *Pickering* v. *Pickering*, 15 N. H. 281, 290, 297; *Chamberlain* v. *Chamberlain*, 43 N. Y. 424, 443. A return from the corporate to the unincorporate form would leave the substance of the trust unchanged.

After a repeal of the supposed charter of 1869, as well as before its enactment, the use of the names of twelve trustees, in conveyances, writs, and judgments, would not be, for them, a serious disadvantage; and some other law than an act of incorporation (which they could refuse to accept) could obviate any public or private inconvenience in the service of process upon them, and relieve them from any personal liability (*Wait* v. *Holt*, 58 N. H. 467; *Hardy* v. *Bank*, 61 N. H. 34, 39), from which they would be exempt under an unconditional charter. By our common law their perpetual succession could be provided for in the original deed, and subsequent gifts to " The Trustees of Dartmouth College " would be equally valid whether the donees were incorporated or not.

When a due examination of the subject has shown how much the effect of incorporation and the effect of repeal have been overrated, and how much obscurity and mystification have arisen from the theory and practice of administering law to a soulless and bodiless figment incapable of rights or duties, a clear view can be had of the college corporation as a body of twelve natural persons, holding the college property in trust, and having a contractual right and a contractual duty, in court and out of court, to defend both the legal and the equitable title.

The act of 1816, upon which the college case arose, expressed a purpose to reconstruct the corporation and convey property that did not belong to the state. It provided that the governor and council should appoint nine additional trustees, and that the nine new trustees and the other twelve should have and hold the legal title of the trust property then vested in the twelve. This provision purported to be a conveyance of a part of the legal title from the twelve to the nine. The authority for the appointment of the nine was not strengthened by its delegation. If there was a legislative power of appointing the nine, the legislature could have exercised it by naming the appointees in the reconstruction act, and could have appointed themselves, or any number of other persons, without regard to the directions given by the donors of the trust fund. There is no constitutional provision dividing every trust fund into twenty-one equal parts, and authorizing a legislative conveyance of nine of the parts from the holder of the legal title to one or more persons selected by the senate and house. Our decision, sustaining the legislative conveyance of 1816, was not based on any distinction between a power to convey a part of the property and a power to convey the whole. If, by New Hampshire law, the act of 1816 was a valid conveyance of a part of the title from the twelve trustees to the nine appointed under the act, then by the same law, from 1784 to the adoption of the federal constitution, the members of the legislature would have made a valid law by conveying to themselves the whole legal title of the college estate, real and personal, and all other property

held in any incorporated or unincorporated trust, without trial, without notice, and without cause, and can make the unilateral conveyance whenever, by amendment or interpretation, the federal restriction is removed. This conception of the law-making character of a conveyance leaves no legal ground for denying the validity of the legislative conveyance of any property, or for asserting the validity of any conveyance not made by legislators. The administration of the law of trusts is either legislative or judicial: it cannot be both. The assertion that it is legislative is a claim that the judicial administration of trusts has been illegal since 1784. And if the administration of fiduciary law is legislative, it remains to be shown how the administration of any law can be judicial.

In the college case, this court held that the conveyance of a part of the legal title and fiduciary right and duty from twelve trustees to nine others was an exercise of legislative power within the meaning of the second article of the state constitution, which vests legislative power in the senate and house. That decision, involving no federal question—no question of right secured by federal law—was not and could not be overruled by the federal court. But it can be sustained only on the theory that the college property is the property of the state, or of a section of the public, and can be placed by the state in the hands of any number of state agents, whom the legislature can elect, and whom the legislature can remove from office at any time, without notice and without cause; and this position is untenable. No part of the title, legal or equitable, is held by the state or any of its territorial divisions. The legal title is in the trustees; and the equitable interest, free from the restriction of a state boundary, is in "youth of the Indian tribes," "English youth, and any others," duly qualified, and seeking the privileges furnished by the trustees' legal execution of the donors' educational purpose. Indirectly, the state, and other states, and the world, may be benefited by gifts of property to the college; but the direct interest of persons entitled to be students of the college is an equitable title containing "private rights . . . which courts of justice are bound to notice,—rights which, if unjustly infringed, even by the trustees themselves, this court, upon a proper application, would feel itself bound to protect." 1 N. H. 122. Although "the students are fluctuating," the proposition of the federal court, that "no individual among our youth has a vested interest in the institution which can be asserted in a court of justice," that the "potential rights" of "the students who are to derive learning from this source" are "incapable of being asserted by the students," and that the students have no "rights to be violated" (4 Wheat. 641, 643), taken in the comprehensive sense in which it would be generally understood, is misleading. Let the trustees unanimously vote, under express statutory permission, to divert

the trust fund from the lawful uses intended by the donors, and, upon complaint duly made (*Attorney-General* v. *Dublin*, 38 N. H. 459; *Hill* v. *Goodwin*, 56 N. H. 441, 453; *Boody* v. *Watson*, 64 N. H. 162, 174; *Attorney-General* v. *Tudor Ice Co.*, 104 Mass. 239) by the students as plaintiffs in interest, it would be found that individuals among our youth have an interest in the institution which the highest law of the state protects.

These rights of the students, like their rights of transportation on railroads, ferry-boats, or steamships, of incorporated or unincorporated common carriers of passengers, and their rights to travellers' accommodations at hotels, are public in a certain sense. They are public in a larger sense than that mentioned in *Old South Society* v. *Crocker*, 119 Mass. 1, 24, 25. They are not derived from and do not depend upon the courtesy of the trustees. But they do not make the college property public in the sense in which the state-house, state library, and state prison are public. On its own land the state, by its legislative agents, can build a road for public use. On the college land, the legislature cannot build a road, against the owner's objection, without paying the owner for a right of way. The states ownership, which is the test of its power to use land as a highway without compensation, is the test of the legislative power of conveying the college property. The state not being the owner of that property, the act of 1816, so far as it purported to convey a part of the college title, was void, and our decision, so far as it sustained the conveyance, was wrong. The act, being an infringement of rights of property and contract reserved by the second, twelfth, fifteenth, twentieth, twenty-third, and thirty-seventh articles of the Bill of Rights, was not an exercise of legislative power.

When the distinction between the so-called imaginary existence of a corporate body, and the actual existence of its lands, goods, and money, is not clearly discerned, there often is an indistinct notion that a legislature, empowered to destroy the owner's life without trial, can lawfully take the property and appropriate it to any use, before or after corporate dissolution, without compensation. But the death of the college corporation would not impair the students' equitable title to the college buildings and funds. This title has the same constitutional protection as any other private property not held in trust. As a way of necessity may be an incident of real estate, so the right of personal liberty includes self-defence and *habeas corpus*, as necessary means of exercising and enjoying it; and the right of property includes the right that an equitable interest shall not fail for want of trustees or other instrumentalities of administration. Adequate remedies, in general, are incidents of substantive constitutional rights. But an equitable title seems insecure when it is supposed to depend upon a corporate holder of the legal title whose fictitious existence may be terminated at any time by voluntary surrender, judicial for-

feiture, or legislative repeal.   The Bill of Rights could have made a distinction between corporate and unincorporate property, or between property held by an incorporated or unincorporated trustee and other property held without a separation of its legal and equitable titles.   A clause could have been inserted expressly excluding either from the general reservation of proprietary rights.   In some jurisdictions, reported decisions have in effect introduced such a discrimination against the equitable owners of corporate property ; and where this error is not distinctly rejected, the impression is by no means rare that for unknown reasons, and to an unknown extent, railroads and other estates held in trust by incorporated persons are peculiarly defenceless.

A belief that Dartmouth students could be deprived of the use and benefit of the college property after a repeal of the charter may have originated in the feudal doctrine of escheat, and the rule that a fee simple given to a corporation is vested in the members " in their politique or incorporate ˌcapacity created by the policy of man, and therefore " the gift is presumed to be upon the condition " that if such body politique or incorporate be dissolved, . . . the donor or grantor shall re-enter, for that the cause of the gift or grant faileth."   Co. Lit. 13 *b*.   The statement that those founders of the college whose contributions were in money retain no interest in the property bestowed upon it, and " the donors of land are equally without interest, so long as the corporation shall exist " (4 Wheat. 641), carries the implication that on a repeal of the charter the personal property would vest in the state, and the real would revert to the donors.   On a repeal of the charter by parliament before the Revolution, " the living donors," says *Marshall*, " would have witnessed the disappointment of their hopes."   4 Wheat. 643.   In 1817, when the case was decided in this court, and in 1819, when it was decided in the federal court, it was understood that escheat and reverter would close the college on a statutory dissolution of the corporation ; and a majority of the federal court held that such a disaster was barred by the king's implied promise that the legislative power of repealing the charter should not be exercised, and by the federal security of that contract.   But it is now settled that the diversion of the corporate property from its equitable owners by escheat and reverter after a charter repeal is an obsolete wrong. *Curran* v. *Arkansas*, 15 How. 304, 310, 312 ; *Broughton* v. *Pensacola*, 93 U. S. 266, 268;  *Greenwood* v. *Freight Co.*, 105 U. S. 13, 19;  *School-District* v. *Greenfield*, 64 N. H. 84, 85; *School-District* v. *Concord*, 64 N. H. 235 ; *People* v. *O'Brien*, 111 N. Y. 1 ; 2 Kent Com. 307, note *b*.

If all the property of Dartmouth college were held, in its present educational trust, by one incorporated person in his corporate capacity, with no special provision for a successor, and all the property of Exeter academy were held in a like trust for that

school by the same person in his unincorporated capacity, with a like want of provision for the future, the dissolution of his corporation by death would have no more effect upon the college than his resignation would have upon the academy. There would be no more forfeiture of either fund than of his own estate.

After corporate dissolution the college property would be as safe, and the execution of the trust as sure, as if the trustees had rejected the charter and accepted all property given them for the college, or the corporation had been legally incompetent to execute the trust (*Chapin* v. *School-District*, 35 N. H. 445, 453, 454, 456), and an unincorporated trustee, appointed in their place, had died. A suspension of the power of repeal is not necessary to prevent the common-law disappointment of the donors' hopes; and the true construction of the state constitution does not expose the college funds to the danger which the federal decision was intended to meet.

The king's contract, suspending the legislative power of repealing the charter, was implied as a means of rescuing the college from a liability to be destroyed by a diversion of the trust property from its intended use after a dissolution of the corporation. The diversion was characterized as perfidious. Indignation was roused by an imagined misappropriation morally equivalent to embezzlement. " Had parliament," says *Marshall*, C. J., " immediately after the emanation of this charter, and the execution of those conveyances which followed it, annulled the instrument, so that the living donors would have witnessed the disappointment of their hopes, the perfidy of the transaction would have been universally acknowledged. . . . The contract would at that time have been deemed sacred by all. . . . This is plainly a contract to which the donors, the trustees, and the crown (to whose rights and obligations New Hampshire succeeds) were the original parties. . . . It is a contract for the security and disposition of property. It is a contract, on the faith of which real and personal estate has been conveyed to the corporation." 4 Wheat. 643, 644.

The prevention of a common-law escheat and reverter of the property after a repeal of the charter was a ground on which the moral right of repeal could be denied. So long as courts held that the trustees' loss of imaginary corporate life would be a common-law reason for inflicting upon the equitable owners a loss of the whole beneficial estate, a repeal of the charter would have been strongly opposed by a sense of justice. But the legal power of repeal can be denied only on legal grounds. A dissolution of the corporation by a voluntary surrender, judicial forfeiture, or legislative repeal of its charter would have raised the judicial question whether the supposed ruinous consequences of dissolution are imposed by the true rule of the common law. An affirmative answer would have raised the legislative question of

changing such a rule; and in the decision of that question the
senate and house might be properly influenced by considerations
of justice and expediency that do not show the legal construction
of the charter and the constitution. If the hopes and intentions
of the donors would now be more exactly fulfilled, and the rights
of the equitable owners more fully enjoyed, without incorporation
than with it, this circumstance would not prove the legality of
repeal. However great the wrongs which courts formerly thought
the common law would commit when corporations were dissolved
by surrender, forfeiture, or repeal, those wrongs were no evidence
of an implied and void covenant made by the king in 1769, for-
ever exempting the college charter from the legislative power of
repeal, vested at that time in parliament, and afterwards in our
senate and house. There is no more implication of a contract on
this subject in the incorporating law of the college than there
would have been if the same law had been enacted by the parlia-
ment of Great Britain or the legislature of this state; and no
more in a special act of incorporation than in a general one.
Under a general law, the deacons of the Congregational church in
Francestown are a corporation holding church property in trust.
G. L., c. 153, s. 6; *Holt* v. *Downs*, 58 N. H. 170, 171, 178. If, on a
dissolution of the corporation, the communion plate should be
taken from its equitable owners and given to the state by an
escheating rule of the common law, the wrong that ought to be
prevented by a repeal of that rule would be no evidence of an
implied legislative contract that the wrong should be prevented
by suspending the power of repealing the incorporating statute.

"A corporation, by the very terms and nature of its political
existence, is subject to dissolution by a surrender of its corporate
franchises, and by a forfeiture of them for wilful misuser and
nonuser. . . . It would be a doctrine new in the law, that the
existence of a private contract of the corporation should force
upon it a perpetuity of existence." "The dissolution of the cor-
poration . . . cannot in any just sense be considered, within
the clause of the constitution of the United States on this subject,
an impairing of the obligation of the contracts of the company,
. . . any more than the death of a private person can be said
to impair the obligation of his contracts. The obligation of those
contracts survives, and the creditors may enforce their claims
. . . in any mode permitted by the local laws." *Mumma* v.
*Potomac Co.*, 8 Pet. 281, 286, 287.

"The obligation of a contract, in the sense in which those words
are used in the constitution, is that duty of performing it which is
recognized and enforced by the laws." *Curran* v. *Arkansas*, 15
How. 304, 319. In that case it was not doubted that the state
could repeal the charter of a bank of which it was sole stock-
holder. The state contended that when it destroyed the corpora-
tion, the contracts made by the bank would no longer be in exist-

ence, and could not be enforced against the corporate property, which, upon the repeal of the charter, would revert, so far as it was realty, to the grantors, and would escheat, so far as it was personalty, to the state. But it was held that the property was charged with a trust which the dissolution of the corporation would not destroy, and that the law, which never allows a trust to fail for want of a trustee, would see to the execution of the trust in behalf of creditors. Repeal does not impair the obligation of contracts which the law enforces after repeal.

The trust which holds the college property for the use and benefit of students is a contract made by the donors and the trustees. And as our common law would enforce their contract, and preserve the rights of the equitable owners, after corporate dissolution as well as before, and the state constitution does not authorize the legislature to impair that contract or those rights, the hopes of the donors cannot be frustrated by legislation during the life of the corporation or afterwards, and no argument can be drawn from the common-law consequences of dissolution against the power of dissolution by surrender, forfeiture, or repeal. It being settled that escheat and reverter would not follow dissolution, the high moral ground on which the federal court held that the repealing power is suspended does not exist. There never was any constitutional ground on which the doctrine of suspension could be maintained; and when judges corrected their views of the common law and vindicated its justice, nothing was left to support the constitutional error in a court of conscience.

If the ancient and obsolete common-law consequences of dissolution were so grievous as to be considered proof of a bargain suspending the legislative power of repeal, why were they not proof of a bargain suspending the judicial power of forfeiture and the trustees' power of surrender? Was it judicial discretion that left the corporation exposed to two modes of destruction? The grantees of the charter were parties to whatever contract was made, and were endowed with contractual capacity. The court was not one of the parties. If the judicial power of forfeiture is saved only because the king's contract bound nobody but himself and those claiming a repealing power by, from, or under him, it must be admitted that the obligation of his contract would not be impaired by an exercise of some other repealing power than his. As it is not claimed that he could suspend any other repealing power than his own, and a repeal of the charter would have been an exercise of the ordinary legislative power of parliament, his promise to abstain from doing what he could not do would have been as nugatory as his illegal and void contract to suspend the legislative power of parliament.

"New Hampshire succeeds," says *Marshall*, C. J., "to the rights and obligations" of the crown. 4 Wheat. 643. The legislature cannot impair the obligation of a contract made by the king or any

other person.   Its impairment being retrospective, and being in other respects a violation of our Bill of Rights, is not legislative in the true legal sense in which the bill expounds the second article of the constitution.   But New Hampshire did not succeed to all the king's obligations.   The state was not bound to pay his debts, and was not his successor in any sense that limits the lawmaking power of repeal.   In the exercise of a power strictly legislative, parliament (commons, lords, and king) could have enacted and repealed the incorporating law called the college charter. Their repeal of it in 1770 would have dissolved the corporation. By an anomaly of the English government, the king could make, and could not repeal, the act of incorporation.

The English Bill of Rights is the substance of a revolution that settled a disputed boundary of royal prerogative.   It effectually demolished " the doctrine of *non obstante's*, which sets the prerogative above the laws," and "maintained the superiority of the laws above the king, by pronouncing his dispensing power to be illegal."   1 Bl. Com. 342 ; 4 *ib.* 440.   Since the enactment of the bill in 1689, the sovereign has had no authority to exempt from legislative repeal a college charter granted either by the king or by parliament.   In the list which the bill gives of the violations of law for which James II was deposed, the first is his usurpation of the dispensing power.   After reciting that he had endeavored " to subvert and extirpate   .   .   .   the laws and liberties of this kingdom by assuming and exercising a power of dispensing with and suspending of laws and the execution of laws, without consent of parliament,   .   .   .   and by divers other arbitrary and illegal courses,   .   .   .   all which are utterly and directly contrary to the known laws and statutes and freedom of this realm," the bill declares " That the pretended power of suspending of laws or the execution of laws by regal authority, without consent of parliament, is illegal ; that the pretended power of dispensing with laws, or the execution of laws, by regal authority, as it hath been assumed and exercised of late, is illegal."   It enacts that all the rights and liberties which it asserts and declares " are the true, ancient, and indubitable rights and liberties of the people of this kingdom."   The twelfth article provides that, without parliamentary authority, "no dispensation by *non obstante* of or to any statute, or any part thereof, shall be allowed, but that the same shall be held void and of no effect."   With these articles are others that changed the dynasty.   To the whole was given " the force of a law made in due form by authority of parliament."

On the death of Anne without issue, in 1714, the crown passed to the house of Hanover by the Act of Settlement of 1701.   By the fourth section of that act, after a preamble reciting that " the laws of England are the birthright of the people thereof, and all the kings and queens who shall ascend the throne of this realm ought to administer the government of the same according to the

said laws," "all the laws and statutes of this realm for securing
. . . the rights and liberties of the people thereof, and all
other laws and statutes of the same now in force," are ratified and
confirmed.

It was not by accident that these metes and bounds were incor-
porated in the foundations of the monarchy. "It had become
indispensable to have a sovereign whose title to his throne was
strictly bound up with the title of the nation to its liberties." In
the Bill of Rights the dynastic change and the king's inability to
suspend the law were joined, and in the act of 1701 their union
was confirmed, in order that the question which had been in dis-
pute between the Stuarts and the people might not again be
stirred. In 1760 this revolution-settlement, continuing to with-
hold the crown from the lineal heir, carried it to George III, in
whose name the Dartmouth charter was granted in 1769.

"We," says James II in 1687, "have thought fit, by virtue of
our royal prerogative, to issue forth this our declaration of indul-
gence . . . We do . . . declare that it is our royal will
and pleasure that from henceforth the execution of all and all
manner of penal laws in matters ecclesiastical . . . be imme-
diately suspended, and the further execution of the said penal
laws, and every of them, is hereby suspended." *King* v. *Sancroft,*
12 St. Tr. 183, 232, 235. "This," says *Powell,* J. (*ib.* 427), "is a
dispensation with a witness. It amounts to an abrogation and utter
repeal of all the laws; for I can see no difference, nor know of
none in law, between the king's power to dispense with laws
ecclesiastical and his power to dispense with any other laws what-
soever. If this be once allowed of, there will need no parliament;
all the legislature will be in the king."

The Stuart precedents of special dispensation concur with the
general declaration of indulgence in leaving no suspension of law
to be supplied by inference. *Godden* v. *Hales,* 11 St. Tr. 1166,
1178-1186; 1 Gutch's Coll. Curiosa 294. In *Sclater's case* the
form is, "We do hereby of our further special grace, certain
knowledge, and mere motion, give and grant unto the said Edward
Sclater our royal licence and dispensation to " violate certain laws,
" without incurring any pain, penalty, loss, . . . or disability
by reason thereof; . . . and we do hereby grant, require, and
command . . . that this our royal licence . . . and dis-
pensation . . . shall be valid in law, and allowed by and in
all our courts, . . . notwithstanding the acts of parliament
hereinbefore mentioned, . . . and any other act, statute, canon,
constitution, provision, or restriction to the contrary thereof in any
wise notwithstanding." 1 Gutch's Coll. 290.

Had an exemption from repeal been granted in the Dartmouth
charter according to the tenor of the familiar precedents of dispen-
sation *non obstante,* and in the terms of an express contract, it would
have taken some such form as this: "We do hereby, of our further

special grace, certain knowledge, and mere motion, for us, our heirs, and successors, give and grant unto the said trustees of Dartmouth college, and to their successors forever, that these our letters patent shall never be repealed by an exercise of legislative power, in whatever person or persons said power may be vested; and it is our royal will and pleasure that the legislative power of repealing said letters patent be immediately suspended; and said power is hereby forever suspended; and we do hereby grant, require, and command that this our royal exemption and dispensation shall be valid in law, and allowed by and in all our courts; notwithstanding the act of parliament 1 W. & M., *sess.* 2, *c.* 2, known as the Bill of Rights; and notwithstanding *s.* 4 of the act of parliament 12 & 13 W. III, *c.* 2, known as the Act of Settlement; and any other act, statute, constitution, provision, restriction, or law to the contrary thereof in anywise notwithstanding; and this grant is a contract binding and disabling the possessors of legislative power forever."

This grant, if valid, would have suspended the fundamental law which authorizes parliament to legislate. It would have been a dispensation and usurpation not less explicit than any of those for which James II was dethroned. There could be no plainer violation of the Bill of Rights, in which the illegality of royal dispensations is set forth as a dominant principle of the constitution and a justification of the Revolution. Except as a forfeiture of the crown, the suspending contract, written in the charter by the king, would have had no effect. It would have been void in the most unqualified sense of invalidity known to English or American law. The charter would have been as repealable by the legislative power of parliament as if the repealing power, instead of being expressly suspended, had been expressly reserved.

The charter contains no exemption from repeal, and no clause or word capable of being understood as an allusion to the subject. Neither in that document nor elsewhere is there any evidence of the grantor's intention to attempt a suspension of the legislative power of repeal, which was vested at the date of the charter in parliament, and afterwards in our senate and house. It was not supposed by him or his grantees that an implied dispensation would be more effective than an express *non obstante*, or that an act of incorporation, which could not be made irrepealable by king, lords, and commons, could be made irrepealable by the king alone. He and his grantees well knew that his contractual suspension of repealing power, in whatever words expressed, or from whatever evidence implied, would insure the immediate repeal of the charter, and imperil the contracting parties, and all others conspiring with them to reverse the Revolution. There is no rule of construction, and no presumption of law or fact, on which a court can find an implied contract of the king to suspend the English constitution

and reopen the question which the nation had settled by expelling the Stuarts and transferring the crown to his family, with an express exclusion of suspending power.

In 1769 men could be found as servile as any of those who drew the Stuart dispensations, and as ready for safe employment. But no one would have engaged, as principal or accessary, in a regal suspension of legislative power with any hope of success or safety, or imagined that the offence would be implied from a mere act of incorporation. It was physically possible for the king to insert in the Dartmouth charter the terms of a contract assuming to exempt the grantees from the legislative power of repeal; but he had no motive to unsettle his own title by a useless violation of the Bill of Rights and the act of 1701. He knew why he reigned instead of Charles Edward. He called himself "a Whig of the Revolution." There was nothing to induce any one to ask a charter that would be repealed as soon as it came to the knowledge of parliament, and would be conclusive evidence that its acceptors had aided and abetted in a lawless attempt to change the powers of government. When so fruitless and hazardous an enterprise is inferred without proof, the presumptions of sanity and legal purpose are set aside without gaining ground of validity or legality. As a matter of law and a matter of fact, an exemption is not proved. It is as certain that it never existed in the intention and understanding of the parties (*Delano* v. *Goodwin*, 48 N. H. 203, 206), as that it was never signed or written or spoken by them or by any one of them. The subject is one on which public opinion, in England and America, has been so unanimous and vehement since 1688 that no successor of James II would have dared to grant, and no grantee named in the charter would have dared to accept, a dispensation *non obstante;* and the grant that would have been unavailing if it had been put in writing, would not be effectual if it were implied. In many cases, the law allows a contract to be proved by circumstantial evidence of the understanding of parties. In some cases it uses a fictitious promise as a form of remedy in the enforcement of legal rights. It does not infer and enforce a contractual suspension and violation of itself.

Since 1688 the right to the crown has been derived from an act of parliament. The grant of the college charter was an exercise of authority conveyed to the grantor, as a part of his office, by a statute that withheld the prerogative of suspending the repealing power. His want of suspending capacity is the beginning of the short chain of the grantees' corporate title. If the English Revolution had not occurred; if the Bill of Rights and the act of 1701 had not been passed, and the king's dispensing power, instead of being renounced by organic laws, had been established by them; and the college charter, instead of being silent on the subject, had contained a promise of exemption from the legislative power of

repeal,—there would have been some ground for the claim that a repeal would impair the obligation of a contract.

When the insignificant effect of corporate dissolution is understood, and the true view is taken of the state constitution and the charter, the constructive suspension of repealing power becomes an effort to avert a danger that does not exist, by setting up a void contract that was not made.

No property has been, or can be, given to the college on the faith of a contract, the illegality and nullity of which had ceased to be an open question eighty years before the date of the charter. The "contract on the faith of which real and personal estate has been and will be conveyed to the corporation" (4 Wheat. 644) is an undertaking of the trustees, implied from their acceptance of each gift, that the property they receive shall be held by them and their legally constituted successors (incorporated or unincorporated), and shall be applied to the uses intended by the donor. To this contract "the crown (to whose rights and obligations New Hampshire succeeds)" (4 Wheat. 643) is not a party. The inviolable "contract for the security and disposition of property" is made by the fiduciary donees, to whose rights and obligations the state does not succeed.

Would the result be different if the charter, instead of being granted by the crown before the Revolution, had been granted by the legislature since the adoption of the state constitution in 1784? This question may arise in determining the effect to be given to the clause reserving the power of alteration, amendment, and repeal, now generally inserted in corporate charters. In construing a reserved power of amending and repealing a charter, it is necessary to inquire whether the reservation has any effect, whether the charter would be amendable and repealable without it, and whether it was a useless effort of a perpetual body of public servants to retain a power of which they were incapable of divesting themselves. By the true construction of the state constitution have the people of New Hampshire conferred upon their legislative agents a contractual authority to deprive those agents and their principals of the whole, or any part, of the sovereign right of legislation? This is not always or generally a federal question. And whatever federal exceptions may be asserted, and whatever judgments federal mandates may require us to render contrary to our opinion, it is the duty of the court to adhere to the local construction believed to be sound. By a general abandonment or suppression of it, we should attempt to throw upon federal judges a responsibility which they cannot rightfully assume, and which they refuse to accept. The correctness of that construction being maintained here in all cases, and being carried into practical effect in the rendition of all judgments not controllable by federal process, there will be no avoidance of responsibility in either jurisdiction.

"The supreme legislative power within this state shall be vested in the senate and house of representatives." Const. of N. H., *art.* 2.   This delegation of power to agents does not authorize them to bind themselves, their successors, and their principals by a promise that all or any part of the delegated power of making law, by repeal or otherwise, shall not be exercised.   The power delegated to these agents, to be used by them according to their discretion and judgment, with no express or implied right of substitution, is not negotiable, and cannot be used by their assignees. *State* v. *Hayes,* 61 N. H. 264, 323–339.   The agents' authority to make law does not enable them to suspend their own duty, and bind their principals, by agreeing with a third party that law shall not be made.   No legal principle allows an agent to disable himself and his principal by divesting them both of the power which the agent is appointed to exercise.   No one contends that the senate and house can change the constitution; no one denies that their valid contract, divesting them of the entire law-making power which the constitution vests in them, would be an amendment of the constitution; and they can no more amend it by destroying a part of that power than by destroying the whole. A construction established by long usage and common consent, even if it is admitted to be erroneous, may be maintained on the authority of precedent.   Its judicial reversal might be unjust, and within the spirit, if not within the legal meaning, of the prohibition of retrospective laws.   *Bellows* v. *Parsons,* 13 N. H. 256, 261; *The Genesee Chief,* 12 How. 443, 458.   But when the true construction is sought, no constitutional line can be found running through the law-making power, and separating destructible parts of it from the rest.   There is not a word in the document expressly indicating the locality or the existence of such a line. By no legal reasoning can it be inferred that the mere grant of legislative power to agents authorizes them to bind their principals by a promise that certain parts of that power shall never be exercised, or shall not be exercised during a specified time. There is no legal measure of the extent to which the state can be thus disfranchised.   There is no legal test for ascertaining the portion of sovereignty that can be suspended or destroyed.

On this question the doctrine of incidental power is irrelevant. "It is   .   .   .   a general maxim that an authority to accomplish a definite end carries with it an authority, so far as the constituent can confer it, to execute the usual legal and appropriate measures proper to accomplish the object proposed." *Valentine* v. *Piper,* 22 Pick. 85, 92; *Commonwealth* v. *Temple,* 14 Gray 69, 77, 80; *Goodale* v. *Wheeler,* 11 N. H. 424, 429; *Boody* v. *Watson,* 64 N. H. 162, 177.   But this rule of construction does not enable the grantee to amend the grant.   By fair construction, a corporation has the incidental authority necessary for the exercise of its express powers; but its alteration of its powers is an amendment of its

charter, which it cannot amend in the slightest degree. By rea-
sonable implication, an agent may do what must be done for the
execution of his express commission,—wherein no alteration,
however minute and however necessary, can be made by him.
The legislative agents of the state have no express or implied
authority to alter the constitution. It would be altered by increas-
ing or diminishing the legislative power vested in them by the
second article, and they would diminish that power if they could
make a charter irrepealable. On the second day of June, 1784,
when the constitution began to be in force, they had the whole
legislative power, including the power of repeal; and from that
day to this, by the true construction, they have been legally inca-
pable of diminishing that power by contract or otherwise. If
there is an irrepealable charter, they have altered their com-
mission. The second article could have been qualified by this
proviso: "But, for a consideration by them deemed sufficient, the
senate and house may, by contract, restrict the legislative power
of repeal within such limits as they think necessary or expedient."
Under such a clause, the extent to which they could reduce the
repealing power would not be a judicial question. The second
article could have also been qualified by the proviso that "for a
consideration by them deemed sufficient, the senate and house
may, by contract, restrict the legislative power of repeal within
such limits as the supreme court of the state think necessary or
expedient." Until this clause or its equivalent is inserted, the
members of this court will not be authorized to determine, accord-
ing to their notions of necessity or expediency, the bounds within
which the legislature may, by contract, restrain the repealing
power. Without an equally explicit amendment, a discretionary
authority to establish such bounds will not be vested in a federal
tribunal. Opinion of *R. B. Taney*, Sept. 5, 1833, in 45 Niles's
Reg. 151, Nov. 2, 1833; *Fletcher* v. *Peck*, 6 Cranch 87, 134, 135,
143; *Goszler* v. *Georgetown*, 6 Wheat. 593, 595, 598; *East Hart-
ford* v. *Hartford Bridge Co.*, 10 How. 511, 534, 535; *Debolt* v.
*Ins. Co.*, 1 Ohio St. 563, 578, 579, 581, 582; *State Bank* v. *Debolt*,
1 Ohio St. 591; *Knoop* v. *State Bank*, 1 Ohio St. 603; *Toledo
Bank* v. *Bond*, 1 Ohio St. 622; *Sandusky City Bank* v. *Wilbor*,
7 Ohio St. 481, 504, 509; *State Bank of Ohio* v. *Knoop*, 16 How.
369, 404, 407, 415, 416, 427–429, 431, 432; *Ohio Life Ins. & T.
Co.* v. *Debolt*, 16 How. 416, 441–444, 451; *Boston Beer Co.* v. *Massa-
chusetts*, 97 U. S. 25, 33; *Stone* v. *Mississippi*, 101 U. S. 814, 817,
819, 820; *New Orleans* v. *Houston*, 119 U. S. 265, 275; *Butchers'
Co.* v. *Crescent City Co.*, 111 U. S. 746, 750, 751; Tiede. Police
Power 190; *Home of the Friendless* v. *Rouse*, 8 Wall. 430, 443,
444; *New Jersey* v. *Yard*, 95 U. S. 104, 114, 115; *Mott* v. *Railroad*,
30 Pa. St. 9, 27, 29, 35, 36, 38; *East Saginaw Mfg. Co.* v. *East
Saginaw*, 19 Mich. 259, 273–277, 282; *Thorpe* v. *Railroad*, 27 Vt.
140, 146; *Raleigh, etc., Railroad Co.* v. *Reid*, 64 N. C. 155, 160.

But if (contrary to the foregoing views) the capacity to sur-render the repealing power is held to exist in the legislature, what language shall be deemed to afford sufficient evidence of a legisla-tive intention to make such surrender?

The power of legislation operates on all persons and all prop-erty. It is granted by all for the benefit of all. It is a part of government, and need not be reserved. When exemption from it is not granted by express contract, a corporation is no more exempted than an unincorporated company or an individual would be, carrying on the same business. *Providence Bank* v. *Billings,* 4 Pet. 514, 561–563. Whenever any power of the state is said to be surrendered or diminished, whether it be the taxing power or any other, the same principle applies, and the rule of construction must be the same. *Charles River Bridge* v. *Warren Bridge,* 11 Pet. 420, 547–550; *Richmond, etc., Railroad Co.* v. *Railroad,* 13 How. 71, 81; *Binghamton Bridge,* 3 Wall. 51, 74, 75, 82; *Turnpike Co.* v. *State,* 3 Wall. 210. "This rule is elementary. . . . In *Charles River Bridge* v. *Warren Bridge,* 11 Pet. 420, 548, the court said this rule of construction was not confined to the taxing power." *Stone* v. *Farmers' L. & T. Co.,* 116 U. S. 307, 326; *Ohio Life Ins. Co.* v. *Debolt,* 16 How. 416, 435; *Jeffer-son Branch Bank* v. *Skelly,* 1 Black 436, 446; *Gilman* v. *Sheboy-gan,* 2 Black 510, 513; *Philadelphia & Wilmington Railroad Co.* v. *Maryland,* 10 How. 376, 393. There is no surrender of the right of taxation, or any other power of sovereignty, unless the surrender is expressed in terms too plain to be mistaken.

If the point were not already adjudged, it would admit of grave consideration whether the legislature can give up the power of taxation any more than they can give up the police power or the power of eminent domain. But the point being adjudged, the surrender, when claimed, must be shown by clear, unambiguous language. *Delaware Railroad Tax,* 18 Wall. 206, 225, 226. It can only be done by a clear expression of the legislative will. *Pacific Railroad Co.* v. *Maguire,* 20 Wall. 36, 42. The language in which the surrender is made must be clear and unmistakable. *Erie Rail-way Co.* v. *Pennsylvania,* 21 Wall. 492, 499; *Memphis Gas Light Co.* v. *Shelby County,* 109 U. S. 398, 401. If, on any fair con-struction, there is a reasonable doubt whether the contract is made out, the doubt must be solved in favor of the state. The lan-guage used must be of such a character as, fairly interpreted, leaves no room for controversy. *Bailey* v. *Magwire,* 22 Wall. 215, 226. Every reasonable doubt should be resolved against it. It is in derogation of public right, and narrows a trust created for the good of all. *Tucker* v. *Ferguson,* 22 Wall. 527, 575. A rea-sonable doubt is fatal to the claim. *Prima facie,* every presump-tion is against it. It is only when the terms of the concession are too explicit to admit fairly of any other construction that the proposition can be supported. *West Wisconsin Railway Co.* v.

*Supervisors*, 93 U. S. 595, 598; *Farrington* v. *Tennessee*, 95 U. S. 679, 686. The affirmative must be shown. Silence is negation, and doubt is fatal to the claim. This doctrine is vital to the public welfare, and axiomatic in the federal court. *Fertilizing Co.* v. *Hyde Park*, 97 U. S. 659, 666; *Hoge* v. *Railroad*, 99 U. S. 348, 355; *Memphis, etc., Railroad Co.* v. *Commissioners*, 112 U. S. 609, 617; *Newton* v. *Commissioners*, 100 U. S. 548, 549, 561, 562; *Southwestern Railroad Co.* v. *Wright*, 116 U. S. 231, 236; *Vicksburg, etc., Railroad Co.* v. *Dennis*, 116 U. S. 665, 667, 668; *Tennessee* v. *Whitworth*, 117 U. S. 139, 145; *Given* v. *Wright*, 117 U. S. 648, 655; *Chicago, etc., Railroad Co.* v. *Guffey*, 120 U. S. 569, 575; Cool. Tax. 70, 205; Cool. Const. Lim. 394, 395; *The Elsebe*, 5 C. Rob. 173.

The New Hampshire rule of charter construction is, in substance and effect, the same as the federal. The legal construction of a charter or other statute is the ascertainment of the legislature's intention. In one sense, their intent is a matter of law: it is a question for the court. In another sense, it is a matter of fact: it is to be determined by the natural weight of competent evidence. *State* v. *Hayes*, 61 N. H. 264, 330. The weight of the evidence is not fixed by an arbitrary rule of strict or liberal construction. But the consequences of a contract wholly or partly releasing one person or all persons from governmental control render it highly improbable that such a surrender is ever intended. A total release of all, rescinding the express agreement written in the first article of the constitution, dissolving the body politic formed by that agreement, and substituting anarchy for government, differs in degree only, and not in kind, from a partial release of one. Whether an alleged abdication and dissolution is total or partial, perpetual or temporary, the inherent improbability of a revolutionary intent is competent evidence, and its natural weight is not overcome by anything less than very clear proof. Legislators are agents (N. H. Bill of Rights, *art.* 8) employed, not in the rescission, but in the performance, of the social contract; and between a total and a partial rescission, no line of legal principle can be drawn as a boundary of their agency.

But the integrity of their principals is not to be unnecessarily impugned by other agents employed in the judicial department. The social contract requires an exact and constant adherence to justice and honesty as virtues indispensably necessary to preserve the blessings of liberty and good government. N. H. Bill of Rights, *art.* 38; Const. of N. H., *art.* 83. And the construction, settled in this state by universal understanding and usage, applies the doctrine of equitable estoppel to such partial and temporary relinquishments of legislative power as have heretofore been made and acquiesced in. When an express promise of exemption from taxation for a term not exceeding ten years (58 N. H. 624; *State* v. *U. S. & Canada Express Co.*, 60 N. H. 219, 259; *Boody* v.

*Watson*, 63 N. H. 320) has induced the promisee to make an investment which the promisors desired him to make, he cannot be defrauded by a repudiation of the promise. If any of the promisors deny the authority of their agents to make the exempting bargain with him, their objection should be seasonably presented for enforcement by an adjudication of the rights of both parties that will prevent his relying upon a promise judicially decided, or universally believed to be valid. When their silence and apparently unanimous assent have led him to change his position, and won for them the stipulated benefit of the investment made by him on the faith of the exempting agreement, they cannot contest their agents' authority to make the agreement. The public and every individual, and all corporations, public and private, are held to one standard of probity. Neither the state nor a municipality can gain an unfair advantage from the promisee's ignorance of law by postponing, till his investment is completed, an objection which is unseasonable after they receive the benefit of their agents' unauthorized contract, and which an honest man, in their situation, would raise before that time or never. Whether this is or is not a sound construction of the constitution we need not inquire. It has been settled too long to be disturbed, and is too firmly planted in moral principle to excite a desire for its reversal, but it cannot be extended beyond cases of equitable estoppel. It detracts nothing from the necessity of strong evidence to show an intention of the legislature to exercise a releasing power which they do not possess, and which cannot be sustained against a seasonable objection.

The enacting clause of English statutes is said to have come into general use as late as the reign of Charles II. When parliamentary legislation recognized the ancient supremacy of the king by taking the form of a petition of the two houses granted by him (1 Bl. Com. 181), his enactment of such a statute as a corporate charter without the concurrence of either house was naturally written, like his conveyance of property, in the terms of a grant. But a valid act of incorporation, by whomever made and in whatever terms expressed, is a law, and a law must be either temporary or perpetual. It was argued by *Story*, J., in the college case, that the charter was made irrepealable by clauses that made it a perpetual law. 4 Wheat. 651, 679, 681, 682, 689.

" Some statutes are temporary, others are perpetual. A temporary statute continues in force, unless it be sooner repealed, until the time for which it is made expires ; a perpetual one until it is repealed. . . . Every statute for the continuance of which no time is limited, is perpetual, although it be not expressly declared so." Bac. Abr., Statute (D). *Ridley* v. *Bell*, 1 Lutw. (*ed.* 1704) 215, 221, was an action of debt on a temporary statute, made to be in force from March 25, 1694, to May 17, 1697, and made perpetual by an act of 1695. In the volume of " Acts and Laws of His Majesty's

Province of New Hampshire," printed in 1771, under the head of " Temporary Laws," are twenty-six statutes, made to be in force for terms varying from two to twenty years. They are preceded by an act of parliament, limited in duration at the time of its passage in 1713, and " Made perpetual by 4 George I, *c.* 12." In 1769, when the college charter was issued by the provincial governor in the name of the king, the distinction, and the legal purpose and effect of the distinction, between perpetual laws continuing in force until repealed, and temporary ones continuing in force during their expressed terms unless sooner repealed, were well understood in this province and in England. On neither side of the ocean did any one imagine that the division of statutes into these two classes made either class, or both, irrepealable or contractual. It was as well understood then as it is now, that one law is called temporary because it will expire at the end of its term if not sooner repealed, and that another is called perpetual because it contains no limit of duration, and will be perpetual if not repealed. Valid acts of incorporation are laws; and the construction that makes them irrepealable because they are either temporary or perpetual makes all laws irrepealable for the same reason.

The usual form of limitation in the tempory laws of the province was, " This act to continue and be in force for the term of —— years, and no longer." In a perpetual law it is not necessary to say, " This act shall continue and be in force forever." Such a provision would be nothing more than correct construction. An act of incorporation, like any other statute, is not temporary unless made so by express limitation; and whether it is temporary or perpetual, it is to be construed like other statutes, unless there is some distinct and sufficient reason for an exception to the general rule. The section, " This act shall continue and be in force for the term of fifty years, and no longer," would have the same meaning in a charter as in any other law; and the section, " This act shall be in force forever," would be as superfluous in one as in the other.

The limiting clause means, " This act, if not sooner repealed, shall continue and be in force for the term of —— years, and no longer." The perpetuity clause means, " This act shall be in force until it is repealed," or " This act is not temporary." Either clause, of itself alone, held to have a meaning in acts of incorporation which it does not have in other laws, would be an anomalous and groundless exception. Construing either clause, without more, to be a contractual and irrevocable surrender of repealing power, would be a violation of the rule that requires clear proof of intended abdication. Language used in every other case for the sole purpose of enacting that a repealable law is or is not temporary, is not clear proof of a purpose to make an incorporating law irrepealable. Legal terms, of established signification, naturally

and ordinarily expressing an intention to fix the duration of a repealable law, are no evidence of an express or implied contract for the surrender of repealing power.

A law may contain the terms of an express contract. When the legislature say, " Towns may by vote exempt" manufacturing establishments from taxation " for a term not exceeding ten years, . . . and such vote shall be a contract binding for the term specified therein " (G. L., c. 53, s. 10), the intention to authorize towns to relinquish tax power is plainly expressed, and the necessity of plain expression is recognized. Equally explicit is their enactment " that upon any of the aforesaid banks accepting and complying with the terms and conditions of this act, the faith of the state is hereby pledged not to impose any further tax or burden upon them during the continuance of their charters." Gordon v. Appeal Tax Court, 3 How. 133, 146. When they say, " This charter shall not be revoked, annulled, altered, limited, or restrained without the consent of the corporation, except by due process of law " (State v. Noyes, 47 Me. 189, 203 ; Railroad Comrs' v. Portland, etc., Railroad, 63 Me. 269, 281 ; Home of the Friendless v. Rouse, 8 Wall. 430–432), there is no doubt of their purpose to surrender the power of repeal. They may express their surrendering purpose in less explicit terms, but when they intend to release any one from their repealing power, it cannot be presumed that they will leave their intention to be inferred from terms that have always been used merely to set forth the temporary or perpetual character of all forms of repealable law, including corporate charters and grants of corporate rights. If the Dartmouth act of incorporation is irrepealable because it is not temporary, nearly all other laws are irrepealable for the same reason.

On the subject of a relinquishment of governmental power the charter of Dartmouth college is silent. There are no words which import a relinquishing contract, and none can be implied. "If we maintain " that there is such a contract, " we must create it by a legal fiction, in opposition to the truth of the fact and the obvious intention of the party. We cannot deal thus with the rights reserved to the states, and by legal intendments and mere technical reasoning take away from them any portion of " their "power over their own internal police." Charles River Bridge v. Warren Bridge, 11 Pet. 420, 548, 549, 552. If there was no implied promise of the state to abstain from destroying the value of the Charles River toll bridge, and the value of its charter, by building a parallel and contiguous free bridge, there was no implied promise to abstain from a repeal of the charter. Story, J., in 11 Pet. 616, 617. That argument has not been answered; and under the true rule of charter construction adopted by the federal and state courts, such charters as those of Dartmouth college and the ordinary railroad charters are not surrenders of the legislative power of amendment and repeal. Notwithstanding the suggestion of Judge Story in the

college case (4 Wheat. 708, 712), that a reservation of that power is always necessary to prevent an implied surrender of it, subsequent decisions of the federal court above cited adopt the true rule that the reservation is not necessary for that purpose. A surrender, actually intended and plainly expressed, would not be accompanied by a reservation of the surrendered power. If the surrender is not plainly expressed, it cannot be implied, and the reservation is superfluous. This is the logical result of the federal cases; and on the questions of state law arising in this case, we are at liberty to take correct views, and to reject the doctrines of surrendering authority and implied surrender that are generally, if not universally, admitted to be unsound, though not overruled in all their applications by the federal court.

The senate and house could not surrender or suspend the legislative power of altering and repealing a corporate charter. Their reservation of the right of alteration and repeal in the modern charters and in the Revised Statutes (*c*. 146, *s*. 26) was a formal resolution to abstain from a contract they could not make, to keep a right they could not give up, and to leave to their successors what they could not withhold from them. Wholly inoperative under the true construction of the constitution and charter, the reservation has all the effect it was designed to have. It protects the state against federal decisions which erroneously take it for granted that the delegation of law-making power to an endless series of legislatures authorizes them at any time to destroy the power continuously and perpetually vested in them and their successors, and that their destruction of it may be presumed without evidence. But even if they could destroy it, and if the reservation of it in modern charters had been omitted, the true construction of those charters would have shown no destroying or suspending contract. Without the reservation, there would have been no more evidence of such a contract, or of any state contract, than there is with it. These conclusions against both the surrendering capacity of the legislature, and the presumption of a surrendering contract, open a way to the merits of the present case unincumbered by the reservation that merely neutralizes those federal errors.

The ground on which the judgment of this court in the *Dartmouth College Case* was reversed (1 N. H. 111, 4 Wheat. 518) has been a prolific source of confusion. The federal decision, that the college charter, when accepted by the grantees, became a contract between them and the government of the country, and could not be repealed by the state after the adoption of the federal constitution, is rendered irrelevant in this case by the amendable and repealable nature of the Northern charter. The federal decision being neutralized by the reserved power of amendment and repeal, the rights of these parties are what they would have been if our decision of the federal question in the college case had been

affirmed by the federal court. But the universal reservation by the states of the power of charter amendment and repeal, expanded ·by a judicial construction based on no legal principle, has introduced in some jurisdictions that practice of impairing the obligation of private contracts which the federal constitution forbids, and which is not an exercise of legislative power. The federal guaranty of inviolability, receiving a federal construction that created a necessity for the reservation which has been so unfortunately construed as to render private contracts violable, and to open the way to the circumvention of all guaranties, illustrates one of the many difficulties and dangers by which free institutions are beset, and one of the ways in which they may be easily and thoroughly changed in substance without any change of form or name. Whatever diversity or unanimity of opinion there may be, at this or any future time, as to the soundness of the federal decision of the federal question, or the soundness of this court's decision of the state question involved in the state's conveyance of college property, there can be no difference of opinion as to the necessity of some other method of constitutional and statutory construction than that which imposes upon judges the duty of deciding, without legal rule, to what extent the reserved power of amending a charter can alter contracts, divert private property from the use, or from the possession and control, to which its owner's agreement has devoted it, and thereby take it from him or his trustees without his or their consent, and without prepayment of its value.

However the amending power may be bounded, it is not restricted by the court's opinion of what is a reasonable alteration. The reasonableness of a charter amendment is a question of fact; and the court's assumption of authority to decide it, turning a question of fact into a question of law, and putting a judicial inquiry in the place of a legislative one, is usurpation. While the exercise of many legal rights may be regulated by state and municipal legislation, the natural, probable, or actual operation of a so-called regulation may show that it infringes a right, or provides unlawful means of infringement. Davis v. School-District, 44 N. H. 398, 404, 405; Yick Wo v. Hopkins, 118 U. S. 356, 371–374. But the rule that renders the by-laws of a corporation void for unreasonableness (Dill. Mun. Corp., s. 319, Mor. Corp., ss. 491–496, and authorities cited in State v. Hayes, 61 N. H. 264, 337) is not applicable, in its literal form, to the ordinary exercise of the state's legislative, judicial, and executive powers. See authorities cited in Orr v. Quimby, 54 N. H. 590, 606–611. A judicial question of the extent of legislative power, being a question of law and not of fact, requires an intelligible ground of law for its decision.

The Northern charter, considered as an agreement in which, by federal construction, the state is one of two contracting parties,

is like any private contract made by A and B, which A reserves a right to alter or rescind without B's consent. The reservation enables A to alter his own agreement by partial or total rescission. It does not make him the owner of B's property, nor enable him to take it or control it, or to acquire, over B's life, liberty, or property, any power, limited or unlimited, legislative or non-legislative, by altering B's agreement, and thereby making an agreement for B, and uniting in himself the contractual functions of both parties. If A rescinds a part, B can rescind the rest. A's right to alter his own agreement by rescinding a part of it, is not greater than his right to rescind the whole. He may exercise his reserved right conditionally or unconditionally. He may make his rescission dependent upon B's refusing to make a new agreement by altering the old one. There may be many reserved options as to the manner of performing the original promise of each party ; but no legal construction can destroy all or any of B's legal rights by giving A an irrevocable authority to bind B by whatever bargain A chooses to make with himself. While the state is the only assenting party necessary for making, altering, or repealing a charter law, it is not the only party necessary for making a contract either by entering into an entirely new agreement, or by assenting to an alteration of an old one.

" The legislature may amend or repeal the law and the contract of this charter, and they hereby acquire absolute dominion over the grantees, and a right to exercise against them the non-legislative power vested in the imperial parliament of Great Britain, and in every other purely despotic government." Such a reservation in the Northern charter would be inoperative beyond the retention of legislative power.* It would not abolish the distinction between the charter law and the charter contract, and would not dispense with the necessity of two assenting parties in a contract. The construction which makes the usual reservation a legislative acquisition of non-legislative power, sets up arbitrary personal will in place of a government of laws. The claim that judges can veto a charter amendment or governmental surrender which seems to them unreasonable (*Sinking Fund Cases*, 99 U. S. 700, 726 ; *Butchers' Co.* v. *Crescent City Co.*, 111 U. S. 746, 750, 751) suggests no limiting law, but another lawless will, concurring or non-concurring on the question of what is reasonable, expedient, or necessary, as a matter of fact. " When we consider the nature and the theory of our institutions of government, the principles upon which they are supposed to rest, and review the history of

---

*Among Judge Doe's memoranda, apparently intended to be used in revising his opinion, are found the following sentences:

"Suppose the legislature reserve power to deprive the stockholders of life and liberty, as well as property, at their discretion."

" There must be a limit to the legal power of individuals to deprive themselves, by contract, of their constitutional rights of life, liberty, and property."

their development, we are constrained to conclude that they do not mean to leave room for the play and action of purely personal and arbitrary power." *Yick Wo* v. *Hopkins*, 118 U. S. 356, 369. Federal decisions based on degrees of reasonableness, policy, or necessity, found by the court as matters of fact in the amendment of charters and the contractual surrender of law-making power, being in conflict with the law of this state, are not followed here, except so far as their authority is paramount on federal questions. The present case is decided upon the local law. While it is a matter of great satisfaction to know that our errors in the decision of federal questions can be corrected by the highest federal court, there is no such relief from (ultimate) responsibility on questions of state law. When the duty of deciding what is the local law of the state is performed, it may be necessary to inquire whether a judgment, required by that law, is forbidden by the federal construction of federal law : but the distinction between the jurisdictions, though obscured and impaired at some points, has not been obliterated. In the local system of this jurisdiction, the inquiry whether a legislative surrender or charter amendment is sufficiently reasonable, expedient, and necessary to be legal, is not a judicial question : and notwithstanding the deference due to the opinions of the federal court on all subjects, we are not at liberty, on a question of state law, to adopt their constructions that introduce a surrendering power deemed reasonable by the court, and require the court to decide the exclusively legislative question of reasonable amendment.

As a vested right requires adequate means of enforcement, and adequate time for bringing an action, a statute of limitations applicable to existing causes of action is construed to give sufficient time. The omission of an express proviso to that effect is attributed to the settled and well known construction that infers an intention to pass a valid act. By the implied proviso, the legislature gives sufficient time; and the question of sufficiency is one of fact. *Willard* v. *Harvey*, 24 N. H. 344, 354, 355; 41 N. H. 555; *Terry* v. *Anderson*, 95 U. S. 628, 633, 634; *Koshkonong* v. *Burton*, 104 U. S. 668, 675.; *Granada County Supervisors* v. *Brogden*, 112 U. S. 261, 269. The abolition of all remedy would be an infringement of right; and a statutory reduction of remedy may raise the question of fact whether what is left is adequate. When a judge holds that a statute on this or any other subject is valid because he thinks it is reasonable, expedient, or necessary as a matter of fact, he undertakes to show on what legal ground he would hold it void if he thought it unreasonable, inexpedient, and unnecessary. The distinction between reasonable and unreasonable amendments of charter law, and between reasonable and unreasonable surrenders of legislative power, is not the universal or the general test of legality. Of the validity of such a legislative amendment of a charter law or a charter contract as alters a party's

substantive right, and not his remedy merely, some other test than reasonableness must be found.

In *Mills* v. *Railroad*, 41 N. J. Eq. 1, under an alterable and repealable charter, and a subsequent statute authorizing all railway companies to lease their roads, a lease of the Central was held void on the ground stated in *Black's Case*, that the corporate business could not be radically changed by the majority, and the ground stated in *Zabriskie's Case*, 18 N. J. Eq. 178, 185, that the power of amendment and repeal was a power reserved by the state to modify and rescind the grant it had made, and not to authorize one part of the corporators to make radical changes in violation of the agreement of all.

The extension of the Old Colony Railroad from Fall River in Massachusetts to Newport in Rhode Island, authorized by the legislature and a majority of the stockholders, was held to be legal because the business to be done in Rhode Island was of the same kind as that done in Massachusetts. *Durfee* v. *Railroad*, 5 Allen 230. The company would be a railway common carrier in both states. The court suggest that a limit of the legislative power of amending the charter, even with the consent of the corporation, might perhaps be found in the doctrine that the corporate powers cannot be extended to enterprises or operations different in their nature and kind from those comprehended in the original charter (*p.* 247). As each stockholder, by taking a share under an alterable charter, assented to an exercise of the entire legislative power of alteration, the doctrine of the *Old Colony Case* is, that he assented to an amendment authorizing the company to extend their road by connecting it with and becoming lessees of all similar roads, and taking assignments of all human business "of a nature similar to" that "embraced within the original grant of power." After the company had exhausted its power of expansion within the limit of similarity, this doctrine of the enlargement of one kind of business, if sound, would not sustain a legislative amendment authorizing the company to transfer all its possessions by a lease under which the lessee would take the place of the lessor in the lessor's common carrier business. As that would be all the business of that kind in the world, the subsequent business of the lessor would be of a different kind. A leasehold extension of the Old Colony, leaving that company for a short time in the business of a common carrier on its original track between Boston and Fall River, followed by its transfer of that track to a lessee for ninety-nine years, would illustrate the difference between taking a lease and giving one. A legislative power of authorizing a majority of the stockholders to make leases as well as accept them, would be based on the theory that each subscriber, by taking a share of stock and paying one hundred dollars to be used in building and operating a railroad from Boston to Fall River, agreed not only that he

might be embarked in the operation of that and all other railroads, but also that he might be thrown out of the carrier business of the road he helped to build, and exposed to the risks of all the railway investments of mankind except the one for which he subscribed. "The power of the proprietors, acting by a majority, . . . is limited to matters properly embraced within the purposes for which the corporation was created." *In re New South Meeting-house*, 13 Allen 497, 510. Contrast *Dorris* v. *Sweeney*, 60 N. Y. 463, with *Schenectady, etc., Plank Road* v. *Thatcher*, 11 N. Y. 102, *Buffalo, etc., Railroad Co.* v. *Dudley*, 14 N. Y. 336, 348, 349, 355, and *Union Hotel Co.* v. *Hersee*, 79 N. Y. 454, 458.

"The original charter conferred upon the company all the usual and necessary powers for locating and constructing a railroad from the town of Hartford to the city of New Haven. The ten shares subscribed for by the defendant were expressly taken upon 'the terms, conditions, and limitations' mentioned in the charter. And such would doubtless have been the legal effect of the subscription, had no reference to the charter been made in it. . . . Since entering into this contract, the plaintiffs have procured an amendment of their charter, by which they have superadded to their original undertaking a new and very different enterprise. . . . Instead of confining their operations to the construction and management of their railroad between Hartford and New Haven, they have undertaken to establish and maintain a line of . . . steamboats. . . . It is most obvious, if incorporated companies can succeed in establishing this sort of absolute control over the original contract entered into with them by the several corporators, there is no limit to which it may not be carried short of that which defines the boundary of legislative authority. The proposition is too monstrous to be entertained for a moment." *Hartford & New Haven Railroad Co.* v. *Croswell*, 5 Hill 383, 385, 386.

"That case," says *Selden*, J., in *Buffalo, etc., Railroad Co.* v. *Dudley*, 14 N. Y. 336, 355, "is in direct conflict with several English cases." Parliament having authority to make any person a member of any incorporated or unincorporated partnership without his consent, and to make any alteration in his helpless condition, and the question in English courts being merely whether parliament intended to exercise this non-legislative power, the decisions of that question are inadvertently cited in a manner that tends to throw doubt upon all constitutional security of private rights, and to countenance the idea that the people of New York are living under a government as absolute as the one they cast off when they ceased to be subjects of Great Britain.

Cases in which a construction is given to the exercise of the unlimited power of parliament, without occasion to consider the legal nature of legislative power, and without regard to the question whether the absolute sovereignty exercised in a particular

instance is legislative, judicial, or executive, or neither, have a tendency, so far as they are followed in this country, to obliterate an essential feature of American government, and to reëstablish the arbitrary dominion that was extinguished in this state by the constitution. *Hammersmith & City Railway Co.* v. *Brand*, L. R. 4 H. L. 171, 196. The argument from British precedent begs the question of legislative authority, and takes it for granted that the people of New Hampshire, who went through the Revolution for rights of life, liberty, and property which they considered natural, essential, and inherent (Bill of Rights, *art.* 2), proceeded deliberately, at the close of the struggle, to set up a government as despotic as the one they overturned. The argument proves too much. If it had any force it would show that the members of the senate and house, by amending wills, conveyances, and laws, can transfer to themselves all property, public and private, that is subject to their legislative control.

The usage of the American colonies and states before the adoption of constitutional limitations has been a misleading precedent. In *Rice* v. *Parkman*, 16 Mass. 326, decided in 1820, a legislative resolve, passed in 1792, had authorized A to sell and convey the real estate of B and C. Of this resolve the court said,—" It is not legislation, which must be by general acts and rules, but the use of a parental or tutorial power for purposes of kindness." " The only object of the authority granted by the legislature was to transmute real into personal estate for purposes beneficial to all who were interested therein. This is a power frequently exercised by the legislature of this state since the adoption of the constitution, and by the legislatures of the province and of the colony while under the sovereignty of Great Britain, analogous to the power exercised by the British parliament, on similar subjects, time out of mind." Under the non-legislative reign of parliament, and the pre-constitutional government of this state, there was no limit of governmental power to be decided or considered by the court. The acts of banishment and confiscation, passed and enforced by the provisional government of the Revolution (Acts of Nov. 19 and 28, 1778, Belk. Hist. N. H., *c.* 26), were as valid as the *Habeas Corpus* act. *Atherton* v. *Johnson*, 2 N. H. 31, 34; *Thompson* v. *Carr*, 5 N. H. 510; *Gould* v. *Raymond*, 59 N. H. 260, 272–275; *Jackson* v. *Stokes*, 3 Johns. 151. If, upon true construction, not modified by usage, the Massachusetts legislature of 1792 could authorize A to make the conveyance that was upheld in *Rice* v. *Parkman*, they could make the conveyance without delegating their authority, could sell A's property without his consent, or authorize B and C to sell it, and can act as guardian and absolute sovereign in all cases in which they choose not to employ agents, in their unlimited control of property and its owners. And if, in addition to the powers of eminent domain, taxation, and police, the senate and house have a general power

of conveying what the state does not own, they can lease any railroad on any terms to whom they please and dispose of any private property as they see fit, can transfer all real and personal estate to one man, or make an annual distribution of it, or enact a universal community of interest in it, and leave it, in common and undivided, to be used by the strongest. On the question of power, English precedent and the pre-constitutional practice of this country establish either boundless despotism or nothing.

In Massachusetts as well as in New Hampshire the law-making branch of government did not wholly abstain from non-legislative acts after the adoption of the legislative limitation. In this state the senate and house continued to grant new trials until 1817. *Merrill* v. *Sherburne*, 1 N. H. 199. The same practice, continued in Massachusetts after the adoption of the state constitution, is now held to be illegal. Quincy Mass. Reports 473, *n.* 17. But the continued exercise of the non-legislative and unlimited power of parliament and the pre-constitutional government of Massachusetts, in the conveyance of property not belonging to the state, was held legal in *Rice* v. *Parkman*, which has become a leading case. Cool. Const. Lim. 97–106. The contrary doctrine has been settled here sixty years. 4 N. H. 572–574. If the property of incorporated or unincorporated partners can be leased for ninety-nine years without the owners' consent, it can be sold without their consent. In Massachusetts and other states, the legislative power of selling private property for the owners' benefit is a survival of the consolidated form of government that enabled parliament and the colonial assemblies to disregard the difference between making law and administering it. When one sale of such property is ordered by a judicial decree ( *Old South* v. *Crocker*, 119 Mass. 1, 26, 27; *Bamforth* v. *Bamforth*, 123 Mass. 280; *Petition of Baptist Church*, 51 N. H. 424; *Methodist Episcopal Society* v. *Harriman*, 54 N. H. 444, 446; Gray Perp., *s.* 590, *n.* 3), and another sale of the same kind and for the same purpose is ordered by a vote of the senate and house, either the court legislate, or the legislature exercise judicial power. There is usurpation on one side or the other.

If a reservation of the power of amending a general or special act of incorporation is a creation, and a conveyance to the legislature of a non-legislative power of altering a partnership contract authorized by the same act, the senate and house, by reservation, can create and acquire the non-legislative power of altering all agreements. "All future contracts, not made under and in accordance with this act, are prohibited. The power of making a contract under this act is granted to those only who accept and exercise the granted power with and upon the condition that the contract may be amended by a power hereby reserved and hereby vested in the legislature. This act shall be a part of every contract; and every stipulation excluding it, and every

device for evading it, shall be illegal and void. All law inconsistent with this act is hereby repealed." Such an act in amendment of the law of contracts would assume, not that partnership and all other private contracts are laws of the land, makable and alterable only by law-makers, but that they are not laws, and can be made and altered by persons who are not legislators, and that the non-legislative power of altering them can be reserved by the senate and house, and added to the law-making power of those assemblies. The power thus reserved would be appropriately exercised by such acts as these: "A's written agreement to pay B $10, ten months after date, without security (or with such security only as a court can give by preventing the debtor's diversion of his property from the payment of the debt before it is due, when the threatened and wrongful diversion is found upon a judicial trial), is hereby amended: the debtor shall give security by paying $1 a month to the trustee of a sinking fund of which the creditor is hereby appointed trustee; but if the debtor chooses to avoid the risks of the sinking trust, he may pay $1 a month to the creditor as creditor." "B's indebtedness to A, secured by mortgage, is hereby amended: the mortgage is discharged." "C's agreement to pay D $10 is hereby amended: the debtor shall pay $100." "The partnership agreement of E, F, and G to run a daily coach between Concord and Lebanon is hereby amended: a majority of them may assign all the partnership business to H by a lease of all the partnership property for ninety-nine years." Each of these amendments would be enacted to overcome an objection, made by one of the contracting parties, to an alteration of his agreement. The amendments would not be valid unless they were law. If they would be law, they could not be made by the contracting parties, and the original contracts and all other agreements not made by law-makers would be void.

In the supposed case of A's unsecured indebtedness, a legislative amendment requiring him, without due process of law, to give such security as his creditor could obtain for due cause shown in a judicial proceeding, would assume that any judgment which one branch of the government can render after trial, another branch can render without a trial; that each branch can do whatever can be done by either of the others; and that their prohibited union (*Ashuelot Railroad Co.* v. *Elliot*, 58 N. H. 451–453) has been effected in a triple form. If the state happened to be the creditor, this amendment would be both a commission issued by the creditor appointing himself judge of his own case, and a judgment rendered by him for the enforcement, not of his legal rights legally ascertained, but of his view of them. A reserved power of amendment that could thus alter a contract of the state, could confer upon any creditor the right of rendering summary judgment against his debtor without trial, and could authorize any debtor to enforce his view of his rights in the same manner.

The supposed amendment of the partnership contract, accompanied by a statutory regulation of the powers of partners under all partnership contracts subsequently made, would mark the distinction between the legislative character of an act that is general and prospective, and the non-legislative character of one that is special and retrospective.   One is an effort to make a contract for E, F, and G by altering their agreement, and to bind them by a partnership contract they have not made: the other requires no one to be a partner.

All rights of property are not contractual; and there are other rights besides those of property: but persons of contractual capacity, who are under the necessity of making any purchase, sale, or other agreement, have no rights that cannot be taken from them by statute, if the senate and house can reserve the non-legislative power of amending contracts.   An act providing that "All rights of property, liberty, and life of every person hereafter making any agreement may be amended by the legislature," would complete the restoration of despotism.   Governments established by agreement can be changed or abolished by agreement: but the government which the legislative, judicial, and executive servants of the state are sworn officially to support, is the limited one established in 1784, and not the unlimited one that was then abolished.   *Gould* v. *Raymond*, 59 N. H. 260, 272–275.

The eleventh section of the charter of the Northern Railroad is,—" The legislature may alter, amend, or modify the provisions of this act, or repeal the same, notice being given to the corporation, and an opportunity to be heard."   If the decision in this case depended on the question of fact whether the company had notice and an opportunity to be heard on the proposed passage of the act of 1883 (*c.* 100), the defendants could be allowed, in some proceeding, to show why that question was not tried at the trial term, and the reasons, if any there are, for a new trial of the case on that point.   The view most favorable to the lease is, that the requirement of notice and an opportunity to be heard was complied with, or was void.   The case is decided without any consideration of the effect of the requirement, upon the assumption that it was complied with, and that, for the practical purposes of this case, the performance of the condition gave *s.* 11 the force of an unconditional reservation of the power of alteration and repeal.

" The reservation affects the entire relation between the state and the corporation, and places under legislative control all rights, privileges, and immunities derived by its charter directly from the state."   *Tomlinson* v. *Jessup*, 15 Wall. 454, 459.   " It was a reservation to the state. . . .   The state was making what had been decided to be a contract, and it reserved the power of change by altering, modifying, or repealing the contract. . . .   It was to avoid the rule in the *Dartmouth College Case*, not that in

*Natusch* v. *Irving*, that the " reservation " was made." *Zabriskie* v. *Railroad*, 18 N. J. Eq. 178, 185, 186.*

In *Stewart* v. *Railroad*, 14 Ohio 353, one of the grounds on which a provisional injunction against a change of railway location between unaltered termini was refused was, that " the original charter conferred authority to make the alteration complained of." Another ground was, that the plaintiffs by the suit sought protection for their interest as stockholders ; that " their interest as landholders upon the route " was their main interest; that were it not for their landholding interest, the injury to their stock would not be a cause of complaint; and that the construction of " a great and important public work " should be suspended by injunction only " to prevent injuries that would otherwise be irreparable, or when the magnitude of the injury to be dreaded is so great and the risk so imminent, that no prudent person would think of incurring it. Then the complainants' right is doubtful; or an action at law or in chancery, prosecuted in the ordinary mode, will afford adequate redress." It was not shown that the public character and importance of the road would legalize a change of route or business in violation of the plaintiffs' rights (54 N. H. 648), and the decision has not shaken the settled doctrine that in this class of cases the plaintiff need not prove actual damage, and is not defeated by proof that he will be benefited by the unauthorized change. The beneficial character of the change may tend to prove the purpose of his litigation, and to disprove his claim for substantial damages in an action at law; but of itself alone, without a purpose inequitable in a legal sense, it is not an answer to a bill for an injunction. *Central Railroad Co.* v. *Collins*, 40 Ga. 582, 617.

By their charter-contract all the stockholders of the Northern Railroad agreed that their partnership business should be the transportation of passengers and freight on their road, including certain incidental enterprises contributing to the transaction of that business. They formed the partnership for no other private purpose than the benefit to be derived from their performance of this contract, legally altered as it may be, under legislative permission, by their express or implied assent. No alteration has authorized a part of the company to suspend the company's performance of the contract by transferring their road and business to other principals for ninety-nine years. The plaintiffs have not acquiesced in the transfer and suspension, but have objected seasonably, and presumably in good faith, for the purpose of protecting their Northern shares. The lease violates the partnership contract, and takes from the plaintiffs an equitable estate of ninety-nine years without their consent, and without prepay-

---

*For a later discussion, by the same judge, of the scope and effect of the reservation, see Opinion of the Justices, 66 N. H., *point* II, *pp.* 635-643.

ment of the value of the estate taken. Whatever names are used to designate the trust and agency of the corporate partnership and the relation existing between each stockholder and the company, he has some remedy for their breach of the contract. " Wherever there is a legal right vested in a party, he must, in some court, have the means of enforcing that right." *Adley* v. *Whitstable Co.*, 19 Ves. Jr. 304, 305.

The private property of the Northern company, subject to a public right of transportation, is held in trust by the corporation for the benefit of the stockholders. The corporation is trustee, holding the legal title. The stockholders are the beneficiaries, holding the equitable interest. " The jurisdiction to enforce performance of trusts arises where property has been conferred upon and accepted by one person on the terms of using it for the benefit of another." Adams Eq. 26. The rule is, that the equitable ownership includes a legal right to a performance of the trust which can be specifically enforced in a court of equity; and the authorities do not recognize a breach of corporate trust as an exception to the rule. *Adley* v. *Whitstable Co.*, 19 Ves. Jr. 304, 306; *Dodge* v. *Woolsey*, 18 How. 331, 341–344; *Hawes* v. *Oakland*, 104 U. S. 450, 457, 458, 460; *Greenwood* v. *Freight Co.*, 105 U. S. 13, 16; *Stevens* v. *Railroad*, 29 Vt. 545, 564; *Peabody* v. *Flint*, 6 Allen 52, 56; *Brewer* v. *Boston Theatre*, 104 Mass. 378, 386, 395, 396; *March* v. *Railroad*, 40 N. H. 548, 567. "A private or trading corporation is essentially a chartered partnership, with or without immunity from personal liability beyond the capital invested, and with certain other convenient attributes which ordinary partnerships do not enjoy. It is also something more than a partnership, because the legal or artificial person becomes vested with the title to all the estate and capital contributed, to be held and used, however, in trust for the shareholders. . . The original subscribers contribute the capital invested, and they and those who succeed to their shares are always, in equity, the owners of that capital. But, legally, the ownership is vested in the corporate body, impressed with the trusts and duties prescribed in the charter." *Comstock*, C. J., in *Bissell* v. *Railroads*, 22 N. Y. 258, 270, 274, 275. Regarded as an imaginary person, the incorporated partners are a trustee whose breach of trust is restrainable by injunction at the suit of an objecting beneficiary, however profitable the breach may be to him. If the artificial body is disregarded, the partnership is as solid a ground of equity jurisdiction without the corporate fiction as with it. Story Eq., *c.* 15. " The important principle, that one out of any number of shareholders or partners is entitled to the protection of the court against the illegal acts of the others, although he stands alone, was emphatically declared and strictly carried out by Lord *Eldon* in *Natusch* v. *Irving* and *Const* v. *Harris*. . . . In those cases Lord *Eldon* was dealing with partnerships and unincorporated companies; but

precisely the same principle applies to all companies, whether incorporated by act of parliament, charter, letters-patent, or registration." Lind. Part. 900.

An injunction against the lease as a breach of the Northern trust is, in effect, a decree that the trustee specifically perform the charter-contract and the trust declared in it. In the bill, the plaintiffs ask that the Northern company and their directors be ordered to resume the control, management, and operation of the Northern road. A decree for the plaintiffs, whether affirmative or negative in form, would run against the trustee,—not a mere imaginary person, but the whole body of stockholders, whose performance of their corporate trust is performance of their partnership contract. Whether the plaintiffs' rights, accruing from the contract, are called contractual or fiduciary, they are subject to the general rule that inequitable performance is not specifically enforced when recoverable damages for non-performance are an ample remedy. The equity to compel specific performance of contract arises where an agreement, binding at law, has been infringed, and the remedy at law by damages is inadequate. Adams Eq. 77; Story Eq., ss. 716, 717, 717 *a ;* Fry Spec. Perf., s. 40; Pom. Spec. Perf., s. 3; *Southern Express Co.* v. *Railroad*, 99 U. S. 191, 200; *Eckstein* v. *Downing*, 64 N. H. 248; *Black* v. *Canal Co.*, 22 N. J. Eq. 130, 399. But the adequacy of a compensatory suit on a broken contract does not always depend upon the breach being financially injurious to the plaintiff. A breach that would be pecuniarily beneficial to him may be of such a nature in other respects that nothing short of prevention will be just. If the price fixed by a written executory agreement for the sale of a farm is more than the value, that fact is not an answer to a bill brought by the purchaser against the vendor for specific enforcement of the agreement. The purchaser, financially benefited by the violation of his legal right, would be financially injured by resorting to the remedy of a suit for nominal damages. "Compensation in damages, measured by the difference in price as ascertained by the market value and by the contract, has never been regarded in equity as such adequate indemnity for non-fulfilment of a contract for the sale or purchase of land as to justify the refusal of relief in equity." *Jones* v. *Newhall*, 115 Mass. 244, 248. The vendor's payment of the difference is not regarded by the law as a full, sufficient reparation for the purchaser who made the contract "on a particular liking to the land." *Buxton* v. *Lister*, 3 Atk. 383, 384; Sto. Eq., s. 717. The damage is irreparable in the legal sense.

A written contract of farming partnership may be specifically enforced by an injunction against its violation when a majority of the partners make an unauthorized attempt to turn the whole partnership property and business over to other principals for ninety-nine years in exchange for an annuity or other investment.

On the question of equity jurisdiction, the mere expediency of the exchange as a financial measure would be as immaterial as the corporate or unincorporate form of the partnership organization. The recovery of one dollar by an expenditure of one hundred, in a suit at law, would not be a sufficient remedy for a partner objecting to the illegal change of his business. Specific relief would not be less necessary than in the case of a refusal to perform a written agreement for the sale of land.

Performance of the Northern charter-contract would not be rendered inequitable in law by the mere fact of non-performance being more beneficial to the stockholders. The plaintiffs' equitable right to be principals in the common-carrier business between Concord and Vermont, according to their contract, would not be barred by a finding that it would be better for them to exchange that business for the occupation of a lessor, or the business of a road running from Concord to Maine or Massachusetts. They have not agreed that their partners may take them from the stipulated position of principals in the work of carrying passengers and freight between Concord and Lebanon, and give them any other vocation in which a court or jury may think they would be more profitably and judiciously employed. Their expulsion for ninety-nine years from the Northern carrier business, in violation of their partnership contract, is a case in which the general principle of equity gives an injunction, and the evidence shows no exceptional reason for withholding the specific relief necessary to prevent their wrongful exclusion from their chosen employment.

The Northern company contend, in argument, that this is an illusory suit, prosecuted not for the protection of the plaintiffs as members of the Northern company, but for the benefit of the plaintiffs and others as members of a hostile company who have no cause of complaint; that the hostile company are the real plaintiffs, prosecuting in behalf of their adverse interest in the name of two of them, and covertly seeking a decree they could not obtain in a suit brought in their own name; and that none of the plaintiffs, apparent or concealed, is entitled to the equitable process of injunction in aid of his attack upon the Northern interest he is pretending to defend. The reserved case does not show a trial of the questions of fact involved in this claim; there is no legal presumption of an undisclosed party or a sinister purpose; and the facts found at the trial and stated in the case do not raise the question of law which the claim proposes. There is no occasion to inquire whether the bill could be maintained if it were illusory, or whether it would be illusory if brought and prosecuted, not for the protection of the plaintiffs as members of the Northern company, but for the benefit of some other company having no cause of action, or for the benefit of the plaintiffs as members of such other company. *Natusch* v. *Irving*, Gow Part. 398; *Colman*

v. *Railway*, 10 Beav. 1, 4, 12; *Winch* v. *Railway*, 16 Jur. 1035, 1040—5 De G. & Sm. 562, 582; *M'Donnell* v. *Grand Canal Co.*, 3 Ir. Ch. 578; *Att'y-Gen.* v. *Great Northern R. Co.*, 2 L. T. Rep. N. S. 653—1 Drew. & Sm. 154, 159; *Forrest* v. *Railway*, 30 Beav. 40—9 W. Rep. 818–820—4 De G. F. & J. 126; *Hattersley* v. *Shelburne*, 31 L. J. 873; *Hare* v. *Railway*, 2 Johns. & H. 80, 119; *Filder* v. *Railway*, 1 Hem. & M. 489, 493, 494; *Pentney* v. *Lynn Paving Com'rs*, 13 W. Rep. 983; *Rogers* v. *Railway*, 2 De G. & J. 662, 674; *Seaton* v. *Grant*, 15 W. Rep. 602—L. R. 2 Ch. App. 459, 464, 465; *Bloxam* v. *Railway*, 16 W. Rep. 490, 494—L. R. 3 Ch. App. 337, 353; *Robson* v. *Dodds*, L. R. 8 Eq. 301; *Salisbury* v. *Railway*, 39 L. J. Ch. 429—18 W. Rep. 484; *Dance* v. *Goldingham*, L. R. 8 Ch. App. 902, 908, 912; *Goodson* v. *Richardson*, L. R. 9 Ch. App. 221, 224; *Regina* v. *Jones*, 5 Vict. L. R. 334—12 Sol. J. 399; *Kenton* v. *Railway*, 54 Pa. St. 401, 452–454; *Camblos* v. *Railroad*, 4 Brewster (Pa.) 563, 592; *Central Railroad Co.* v. *Collins*, 40 Ga. 582, 616; *Ramsey* v. *Gould*, 57 Barb. 398—8 Abb. Pr. N. S. 174; *Waterbury* v. *Express Co.*, 50 Barb. 157, 168; *Belmont* v. *Railway*, 52 Barb. 637, 662; *Hull* v. *Ely*, 2 Abb. New Cas. 440; *Edwards* v. *Mining Co.*, 38 Mich. 46; *Camden & Atlantic Railroad Co.* v. *Elkins*, 37 N. J. Eq. 273, 275; *Landis* v. *Landis*, 41 N. J. Eq. 119; Mor. Corp., *ss.* 259–262, 266, 267, 1041; Bri. Ult. V. (2$^d$ Am. ed.) 652, note *b*; Kerr Inj. 480; Cook, Stockholders, *s.* 690.

The plaintiffs' intention to obtain a decree against the validity of the lease for the sole benefit of a company having no legal ground of complaint would not bar the plaintiffs' right of action, but would raise the question whether they could maintain assumpsit against the Northern for breach of the charter-contract, and whether such an action would furnish all the legal process that justice would require.

[After discussing the questions last suggested,* the opinion closes as follows:]

On the facts found at the trial term, the plaintiffs' right of action for damages, and the adequacy of that remedy when specific performance is asked for an inequitable purpose, are hypothetical questions. On the question of justice, the plaintiffs have the affirmative, and the burden of proof. *Pickering* v. *Pickering*, 38 N. H. 400, 409. But as they were not informed by pleading or evidence that their purpose was impugned, or that there was any contention as to who the real plaintiffs are, they might well infer these were not points of controversy, and submit the case on the facts usually proved in this class of cases when the plaintiffs' motive and identity are not contested. Had these points been seasonably raised, there would naturally have been a trial of them,

---

* Compare Doe, C. J., in *Boston, Concord & Montreal Railroad* v. *Railroad* 65 N. H. 393, 401.

and a finding of all relevant facts, unless the plaintiffs obtained leave to change the course of litigation by a declaration in assumpsit against the Northern company, filed as an amendment of the bill. The suit not being found to be illusory by the judge who heard the evidence, and no suggestion of illusiveness as a question of fact having been made at the trial, the plaintiffs are entitled to such a decree against the breach of trust as will accomplish their presumed purpose of protecting their Northern shares. Assuming that the case is what it appears to be, it is equitable that an injunction should stop the violation of the partnership contract.

*Decree for the plaintiffs.**

---

* See note at beginning of opinion.